## EAST OHIO GAS CO. v. FEDERAL POWER COMMISSION (STATE OF OHIO et al., Intervenors).

### No. 9741.

United States Court of Appeals
District of Columbia Circuit.

Argued Dec. 9, 1948.

Decided Feb. 14, 1949.

EDGERTON, Circuit Judge, dissenting.

———◆———

Mr. William B. Cockley, of Cleveland, Ohio, with whom Messrs. Walter J. Milde and Wm. A. Dougherty, both of Washington, D. C., C. W. Cooper, of New York City, and Sturgis Warner, of Washington, D. C., were on the brief, for petitioner. Mr. Warren S. Ege, of Washington, D. C., also entered appearance for petitioner.

Mr. William S. Tarver, Assistant General Counsel, of Washington, D. C., with whom Messrs. Bradford Ross, General Counsel, Louis W. McKernan, Bernard A. Foster, Jr., and Howell Purdue, Attorneys, Federal Power Commission, all of Washington, D. C., were on the brief, for respondent.

Messrs. Hugh S. Jenkins, Attorney General, and Harry G. Fitzgerald, Jr., Assistant Attorney General, were on the brief for Intervenors State of Ohio and The Public Utilities Commission of Ohio, urging reversal.

Before EDGERTON, CLARK, and PRETTYMAN, Circuit Judges.

CLARK, Circuit Judge.

The case is before this court on the petition of the East Ohio Gas Company (hereinafter alternatively referred to as East Ohio or as petitioner) for review of certain orders of the Federal Power Commission (referred to hereinafter as the Commission or the respondent). The orders sought to be reviewed found East

Ohio to be a "natural-gas company" within the meaning of the Natural Gas Act of 1938, as amended,[1] subject to the jurisdiction of the Commission and ordered East Ohio: (1) To comply with all previous general accounting orders of the Commission applicable to "natural-gas companies"; (2) to comply with all previous Commission orders requiring the filing of annual reports; and (3) to file with the Commission within 90 days the data, statements and reports required by previous orders insofar as it reasonably could and to inform the Commission when the remainder could be filed.

During all the proceedings before the Commission the effectiveness of the orders here under review was stayed by the Commission in order to preserve the *status quo*. Similarly, upon petition of East Ohio, and the respondent having filed consent thereto, this court granted a stay pending its decision on review.

Although the petitioner and the respondent differ radically as to the interpretation of the facts of the case and their net effect, as might be expected, there is no controversy as to the material facts themselves. East Ohio is an Ohio corporation with its principal place of business in Cleveland, Ohio. The very heart of the instant controversy is the definition of the nature of East Ohio's business, petitioner and the intervenors claiming that East Ohio is solely engaged in the business of direct, local distribution of natural gas in the State of Ohio, and respondent claiming that petitioner is in the business of transporting gas in interstate commerce. Postponing, for the moment, further discussion of that critical question, it is certain that all property and facilities owned and operated by East Ohio lie within the physical boundaries of the State of Ohio, that East Ohio distributes natural gas in Ohio by means of an extensive pipeline system,[2] and that none of East Ohio's pipelines crosses state lines. Further, it is uncontroverted that petitioner makes no sales of any kind to any other company for resale purposes and that none of the gas sold by petitioner is consumed outside of Ohio, that is, none of the gas in the pipelines of East Ohio flows out of the State of Ohio.

Petitioner's sources of natural gas are threefold. As of 1945,[3] petitioner got 62% of its gas from the Hope Natural Gas Company (hereinafter called Hope), 23% from the Panhandle Eastern Pine Line Company (hereinafter called Panhandle), and 15% from native Ohio fields.[4] The gas procured by East Ohio from Hope and from Panhandle is concededly gas from sources outside the State of Ohio (principally from West Virginia, Texas, Oklahoma and Kansas). The gas procured from Hope first enters petitioner's pipeline system principally at two points *in Ohio* known as Pipe Creek Station and Clarington Station, both on the Ohio side of the Ohio River. Panhandle gas first connects with and joins the East Ohio system at Maumee, Ohio, a point about 40 to 50 miles east of the western boundary of Ohio. The first point locally-produced gas enters the pipelines of petitioner is a point in Harrison County, Ohio, about 40 miles from the Ohio-West Virginia state line. It is established by the record and found by the Commission that East Ohio serves more than 551,000 consumers in 69 north-

---

[1] 52 Stat. 821 (1938), 15 U.S.C. § 717 et seq. (1946). [15 U.S.C.A. § 717 et seq.]

[2] According to the briefs of petitioner and of intervenors, East Ohio's pipeline property, using the accounting classification required by the Public Utilities Commission of Ohio, was, in 1945, as follows:

|  | Miles |
| --- | --- |
| Distribution lines | 5,490 |
| Storage lines | 672 |
| Field lines | 1,011 |
| Transmission lines | 903 |
| Total | 8,076 |

[3] The Commission proceedings from which the orders under review arose commenced in early 1946. The statistics presented before the Commission were necessarily those pertaining to petitioner's property and activities during the preceding year and all facts and figures contained in this opinion, unless otherwise specified, refer also to the year 1945.

[4] These three percentages, set forth in even numbers for convenience, are accurate within .5%.

eastern Ohio communities having an estimated total population of over 2,000,000 people. The total sales figure of petitioner in 1945 was 77,428 million cubic feet (Mcf).[5] Much is made by the Commission of the fact that petitioner receives its gas from both Hope and Panhandle at high pressures which, in most cases, are sufficient to propel the gas through petitioner's large trunk lines to their ultimate destination without repumping. East Ohio does not deny that this is so. On the other hand, the Commission, both in its several orders and in its brief in this case, passes rather lightly over the fact which we consider extremely important, namely, that East Ohio has long been subject to complete regulation by the Public Utilities Commission of Ohio, intervenor herein.

The Ohio Commission was created in 1911. Ever since that date it has repeatedly and continuously exercised its regulatory powers over all the business activities and property of petitioner. This regulation has included the setting of numerous rates, the supervision of acquisitions and sale of property and security issues, the control of accounting practices, inauguration and termination of service, examining service complaints, and requiring the submission of detailed reports to the Ohio Commission. Abundant state statutory authority exists for this regulation by the Ohio Commission[6] and the state regulation authorized is mandatory, not permissive. As of the time of the hearings before the Commission in this case there had been a total of 258 formal regulatory proceedings before the Ohio Commission involving East Ohio. There can be little doubt that petitioner is now and has been very thoroughly and completely regulated by the Ohio Commission.

Since numerous prior proceedings shed some light on the issue in the present case, it is deemed necessary to discuss briefly those proceedings at this point. The Natural Gas Act became law on June 21, 1938. In October of the same year, the City of Cleveland, then engaged in a rate controversy with East Ohio before the Ohio Commission, filed a petition with respondent Commission praying for an investigation of East Ohio's cost of transportation of gas from the Ohio River to the Cleveland city gate. The Cleveland petition also asked that East Ohio be ordered to file an inventory of its property devoted to the transportation of natural gas and a statement of the original cost thereof. On February 14, 1939, the Commission issued an order in which the Commission found East Ohio to be a "natural-gas company" within the meaning of the Act and ordered East Ohio to file an inventory and statement of original cost of its property. This order was entered on the Commission's own motion and without hearing. East Ohio's application for a hearing, rehearing and stay of that order on the ground that its transportation was incident to local distribution having been unsuccessful, it filed a petition for review in the United States Circuit Court of Appeals for the Sixth Circuit (now the United States Court of Appeals for the Sixth Circuit). That court dismissed the petition for want of jurisdiction, it being the opinion of the court that the order was preliminary and not reviewable.[7] On three occasions since that dismissal, East Ohio applied for, and was granted by the Commission, certain certificates concerning its operation. In each of these three applications East Ohio asked in the alternative that the Commission declare that East Ohio is not a "natural-gas company" within the meaning of the Act. The Commission each time denied the alternative request. No judicial review was sought of any of these three certifi-

[5] The total sales figure is broken down in the following manner: Sold to domestic consumers—46,674,457 Mcf; Sold to industrial consumers—30,126,754 Mcf; and Field sales—627,196 Mcf. Field sales are made from the Ohio producing fields and the gas is entirely consumed in Ohio.
[6] Intervenors, the State of Ohio and the Public Utilities Commission of Ohio, have provided us with excerpts from the Ohio General Code relating to public utility regulation. These excerpts are in pamphlet form, printed in 1946. We have examined the cited portions of the Ohio General Code contained therein (particularly §§ 614-2a, 614-4, 614-8, 614-10, 614-48, and 614-60) and find them definitely applicable to East Ohio.
[7] East Ohio Gas Co. v. Federal Power Commission, 1940, 115 F.2d 385.

cate proceedings, it being the position of East Ohio that it was not then a party aggrieved by the orders granting the certificates to it so as to justify the seeking of judicial review.[8] Petitioner further asserts that prudence required that it apply for these certificates but that it has otherwise never voluntarily submitted to the jurisdiction of the Commission and that it has never otherwise complied with any of the Commission's general orders, including those now under review.

The order or orders presently under review require petitioner's complete submission to the jurisdiction of the respondent and further require, as we have seen above, the preparation of annual financial and statistical reports covering *all* of petitioner's properties and operations, year by year, since 1939. By these orders East Ohio is also required to change its entire accounting system for all of its properties so as to conform to the accounting system prescribed by the Commission, namely, one subscribing to the "original cost" theory of accounting. Petitioner claims, and it is uncontroverted, that the cost to petitioner of compliance with the orders being reviewed would now be between $1,500,000 and $2,000,000.[9]

The State of Ohio and the Public Utilities Commission of Ohio, both parties to the proceedings below, have been allowed to intervene here and both support the contentions of East Ohio.

The Natural Gas Act, which controls the disposition of the present case, commences with the declaration that "the business of transporting and selling natural gas for ultimate distribution to the public is affected with a public interest" and hence subject to federal regulation.[10] Immediately

thereafter, Section 1(b) of the Act provides as follows:

"The provisions of this Act shall apply to the transportation of natural gas in interstate commerce, to the sale in interstate commerce of natural gas for resale for ultimate public consumption for domestic, commercial, industrial, or any other use, and to natural-gas companies engaged in such transportation or sale, *but shall not apply to any other transportation or sale of natural gas or to the local distribution of natural gas or to the facilities used for such distribution or to the production or gathering of natural gas.*"[11] (Emphasis supplied.)

Section 2 of the Act, containing definition of terms used in the Act, reads in pertinent part as follows:

"When used in this Act, unless the context otherwise requires—

\*   \*   \*   \*   \*   \*

"(6) 'Natural-gas company' means a person engaged in the transportation of natural gas in interstate commerce, or the sale in interstate commerce of such gas for resale.

"(7) 'Interstate commerce' means commerce between any point in a State and any point outside thereof, or between points within the same State but through any place outside thereof, but only insofar as such commerce takes place within the United States."[12]

■ It was the conclusion of the Commission below, and it is its present contention on appeal, that because East Ohio owns and operates about 650 miles of large-diameter, high-pressure pipeline which connect up with those of Panhandle and Hope, which 650 miles represents about 8% of the total miles of pipeline owned and oper-

[8] Section 19 (b) of the Natural Gas Act, 52 Stat. 831 (1938), 15 U.S.C. § 717r (b) (1946), [15 U.S.C.A. § 717r (b)] provides for judicial review of Commission orders by "any party to a proceeding under this Act aggrieved by an order issued by the Commission in such proceeding."

[9] In this regard, the Commission, in its opinion and order of November 6, 1947, states that: " * * * the unsupported estimate of cost of reclassification and original cost studies is not convincing, for

our experience with other companies with greater property investment indicates that this estimate is considerably exaggerated."

[10] 52 Stat. 821 (1938), 15 U.S.C. § 717(a) (1946). [15 U.S.C.A. § 717(a)]

[11] 52 Stat. 821 (1938), 15 U.S.C. § 717(b) (1946). [15 U.S.C.A. § 717(b)]

[12] 52 Stat. 821, 822 (1938), 15 U.S.C. §§ 717a (6) and (7) (1946). [15 U.S.C.A. §§ 717a (6) and (7)]

ated by East Ohio, it (East Ohio) is a natural-gas company "engaged in the transportation of natural gas in interstate commerce" under Section 2(6) of the Act, supra, and thus subject to Commission jurisdiction. We do not agree with the Commission in this respect. Further, we do not believe that the above-quoted portions of the Act either expressly or impliedly include, or were intended to include, the above-mentioned activities of petitioner. The Act says that a natural-gas company is one which is engaged in the transportation of natural gas in interstate commerce and it defines interstate commerce, for purposes of administration of the Act, as "commerce between any point in a State and any point outside thereof, or between points within the same State but through any place outside thereof". We think it obvious that East Ohio does not engage in the transportation of natural gas in interstate commerce by the very definition of such commerce provided in the Act. Moreover, the Act, in Section 1(b), supra, expressly states that it shall *not* apply "to any other transportation or sale of natural gas or to the local distribution of natural gas or to the facilities used for such distribution or to the production or gathering of natural gas." Not only does East Ohio produce or gather natural gas, but it strongly urges, and we believe the previously discussed facts clearly demonstrate, that it is engaged *solely* in the local distribution of natural gas to local consumers. *All* of its property, including the 650 miles of high-pressure lines, is devoted to that sole purpose. Thus, once again, the very words of the Act exclude petitioner from its administration.

In holding as we do that petitioner herein is not engaged in the transportation of natural gas in interstate commerce within the meaning of the Act, we are not unaware of the modern trend of judicial opinion toward great expansion of federal powers under the ever-broadening concept of what constitutes interstate commerce.[13] However, where, as here, Congress has spoken explicitly and has, we must assume, purposefully provided an express definition of interstate commerce in the very Act which governs in this case, we take it to be not only the logical but the proper course for us to be governed by that express definition, in the absence of constitutional prohibitions, and not to search elsewhere for definition among *judicial interpretations* of the concept of interstate commerce.[14]

Sufficient has been said to support our conclusion that respondent Commission lacks jurisdiction over East Ohio and hence that the orders under review herein must be reversed insofar as they require compliance by East Ohio. Since, however, both petitioner and respondent rely heavily on the so-called legislative history of the Act as showing the intent of Congress at the time of the enactment of the Natural Gas Act, we deem it desirable to discuss briefly our view of the intent of Congress, bearing in mind constantly that any attempt to probe the collective mind of Congress as of a given time is at best speculation aided only by such written reports and accounts of committee proceedings as are available in the form of Senate and House documents, reports, and resolutions and in the form of excerpts from the *Congressional Record* and in other matters of public record. Fortunately for this court, the legislative history of the Natural Gas Act is not a new subject, it having received rather thorough treatment in several opinions of the Supreme Court. In one of those opinions, Public Utilities Commission of Ohio et al. v. United Fuel Gas Co. et al., 1943, 317 U.S. 456, 63 S.Ct. 369, 87 L.Ed. 396, Mr. Justice Frankfurter, speaking for the majority, said:

"It is clear, as the legislative history of the Act amply demonstrates, that Congress meant to create a comprehensive scheme of regulation which would be *complementary in its operation to that of the states, without any confusion of functions.* The Federal Power Commission would exercise jurisdiction over matters in inter-

---

13 See Humes, Trend of Decisions Respecting the Power of Congress to Regulate Interstate Commerce (1940) 26 A. B.A.Journal 846, and cases cited therein.

14 Cf. Border Pipe Line Co. v. Federal Power Commission, D.C.Cir., 171 F.2d 149 (1948).

state and foreign commerce, *to the extent defined in the Act,* and local matters would be left to the state regulatory bodies. Congress contemplated a harmonious, dual system of regulation of the natural gas industry—federal and state regulatory bodies operating side by side, each active in its own sphere. See H.Rep. No. 2651, 74th Cong., 2d Sess., pp. 1–3; H.Rep. No. 709, 75th Cong., 1st Sess., pp. 1–4; Sen.Rep. No. 1162, 75th Cong., 1st Sess." [15] (Emphasis supplied.)

In another of those opinions, Panhandle Eastern Pipe Line Co. v. Public Service Commission of Indiana et al., 1947, 332 U. S. 507, 68 S.Ct. 190, Mr. Justice Rutledge, speaking for a unanimous Court, said:

"The Act, though extending federal regulation, had no purpose or effect to cut down state power. On the contrary, perhaps its primary purpose was to aid in making state regulation effective, by adding the weight of federal regulation *to supplement and reinforce it in the gap created by the prior decisions.* [Footnote reference omitted] The Act was drawn with meticulous regard for the continued exercise of state power, not to handicap or dilute it in any way. This appears not merely from the situation which led to its adoption and the legislative history, including the committee reports in Congress cited above, but most plainly from the history of § 1(b) in respect to the changes which took place in reaching its final form." [16] (Emphasis supplied.)

It is clear from the foregoing that the plain intent of Congress in enacting the Natural Gas Act, as interpreted by the Supreme Court, was to fill in the gap in regulation of the natural gas industry by supplementing existent state regulation with federal regulation of activities beyond the scope of regulatory authority of the state commissions. Viewed in this light, we deem it abundantly manifest that the Act was never intended to confer jurisdiction over such a company as East Ohio since

that company was already completely and validly regulated by the Ohio Commission long prior to the passage of the Act. Stated somewhat differently, the Act does not apply to petitioner, and in fact expressly excludes it, there being no regulatory gap to be filled in. All of the gas coming to East Ohio from out of state, gas furnished primarily by Hope and Panhandle, is already completely subject to federal regulation and comes to East Ohio at a rate set by the federal commission. There is thus obviously no gap in regulation in this case and the attempted assumption of jurisdiction by the federal commission in this instance, far from supplementing and reinforcing, constitutes unnecessary, undesirable and unintended usurpation of state regulatory authority which cannot be justified by either the terms of Act or its legislative history.

To show that the Federal Power Commission itself had complete understanding of the purpose of the Act just prior to its passage, we need only to quote from a statement made by Dozier A. DeVane, Solicitor of the Federal Power Commission, before a subcommittee of the House Committee on Interstate and Foreign Commerce in 1936, as follows:

"The whole purpose of this bill is to bring under Federal regulation the pipe lines and to leave to the State Commissions control over distributing companies and over their rates, *whether that gas moves in interstate commerce or not.*" [17] (Emphasis supplied.)

Finally, we are not required to speculate as to the cost to East Ohio of compliance with the Commission orders under review, for if, as we hold herein, the Commission lacks jurisdiction to enter those orders, they are, of course, a nullity as to East Ohio. We therefore reach no decision as to the reasonableness or constitutional validity of the orders. Nor do we deem it of any significance that East Ohio applied for and received certificates in the

---

[15] 317 U.S. at page 467, 63 S.Ct. at page 375, 87 L.Ed. 396.

[16] 332 U.S. at pages 517, 518, 68 S.Ct. at page 195.

[17] Hearing before a Subcommittee of the Committee on Interstate and Foreign

Commerce, House of Representatives, Seventy-Fourth Congress, Second Session, on H.R.11662 (a predecessor bill to that which ultimately became law as the Natural Gas Act), at page 24.

past from respondent Commission, since no actions of either party, either voluntary or involuntary, can confer jurisdiction where it otherwise does not exist and where, as we have seen, the Act expressly prevents the attachment of jurisdiction and lays down the jurisdictional limits beyond which the Commission shall not trespass.

Accordingly, the orders involved herein, insofar as they purport to pertain to East Ohio, are

Reversed.


EDGERTON, Circuit Judge (dissenting).

The present petitioner was the appellant in East Ohio Gas Co. v. Tax Commission of Ohio, 1931, 283 U.S. 465, at page 470, 51 S.Ct. 499, at page 500, 75 L.Ed. 1171. The Supreme Court said unanimously: "The transportation of gas from wells outside Ohio by the lines of the producing companies to the state line and thence by means of appellant's high pressure transmission lines to their connection with its local systems is essentially national—not local—in character and is interstate commerce within as well as without that State. The mere fact that the title or the custody of the gas passes while it is en route from State to State is not determinative of the question where interstate commerce ends." Cf. Southern Natural Gas Corporation v. Alabama, 1937, 301 U.S. 148, 154, 57 S. Ct. 696, 81 L.Ed. 970.

Congress passed the Natural Gas Act in 1938. The Supreme Court has said unanimously: "There is nothing in the terms of the Act or in its legislative history to indicate that Congress intended that a more restricted meaning be attributed to the phrase 'in interstate commerce' than that which theretofore had been given to it in the opinions of this Court." Interstate Natural Gas Co., Inc. v. Federal Power Commission, 1947, 331 U.S. 682, 688, 67 S.Ct. 1482, 1486, 91 L.Ed. 1742.