# FEDERAL POWER COMMISSION $v$. EAST OHIO GAS CO. ET AL.

No. 71.   Argued November 10, 1949.—Decided January 9, 1950.

*Bradford Ross* argued the cause for petitioner. With him on the brief were *Solicitor General Perlman, Assistant Attorney General Morison, Robert L. Stern, Paul A. Sweeney, Melvin Richter, Bernard A. Foster, Jr.* and *Howell Purdue.*

*Harry M. Miller* argued the cause for the State of Ohio et al., respondents. With him on the brief were *Herbert S. Duffy,* Attorney General, and *Kenneth B. Johnston,* Assistant Attorney General.

*William B. Cockley* argued the cause for the East Ohio Gas Co., respondent. With him on the brief were *Walter J. Milde, Wm. A. Dougherty, C. W. Cooper* and *Sturgis Warner.*

By special leave of Court, *Walter R. McDonald* argued the cause and filed a brief for the Indiana Public Service Commission et al., as *amici curiae,* urging affirmance.

Briefs of *amici curiae* urging affirmance were filed by *Everett C. McKeage* and *H. F. Wiggins* for the Public Utilities Commission of California, and by *George H. Kenny* for the Public Service Commission of New York.

Mr. Justice Black delivered the opinion of the Court.

Section 1 (b) of the Natural Gas Act[1] provides that the Act "shall apply to the transportation of natural gas in interstate commerce, to the sale in interstate commerce of natural gas for resale for ultimate public consumption . . . and to natural-gas companies engaged in such transportation or sale, but shall not apply to any other transportation or sale of natural gas or to the local distribution of natural gas or to the facilities used for such distribution . . . ." Section 2 (6) defines "natural-gas company" as "a person engaged in the transportation of natural gas in interstate commerce . . . ." The Federal Power Commission, after hearings, found as facts that respondent East Ohio Gas Company was a natural-gas company and subject to the Commission's jurisdiction.[2] On these and subsidiary findings the Company was ordered to keep accounts and submit reports as required by the Act.[3] The Commission rejected the Company's contentions[4] that its operations were not covered by the Act and that the expense of supplying the required information was so great as to transgress statutory and constitutional limits.[5] The Court of Appeals for the District of Columbia, without reaching other contentions, reversed the Commission's orders on the ground that the Company was not "engaged in the transportation of natural gas in

---

[1] 52 Stat. 821, as amended by 56 Stat. 83, 15 U. S. C. § 717 *et seq.*

[2] The Commission instituted the proceedings on its own motion and on complaint of the City of Cleveland, Ohio. Later other Ohio cities filed similar complaints. See 1 F. P. C. 586; 4 F. P. C. 15; 4 F. P. C. 497.

[3] See note 15 *infra.*

[4] The Public Utilities Commission of Ohio, an intervenor, made substantially the same contentions.

[5] 74 P. U. R. (N. S.) 256. Related orders and discussions appear in 4 F. P. C. 15, 497, 638, 28 P. U. R. (N. S.) 129; *East Ohio Gas Co.* v. *Federal Power Comm'n,* 115 F. 2d 385.

interstate commerce within the meaning of the Act." [6]
Importance of the questions to administration of the Act
prompted us to grant certiorari. 337 U. S. 937.

## I.

East Ohio owns and operates a natural-gas business
solely in Ohio, selling· gas to more than half a million
Ohio consumers through local distribution systems. Most
of this natural gas is transported into Ohio from Kansas,
Texas, Oklahoma, and West Virginia through pipe lines
of Panhandle Eastern Pipe Line Company and of Hope
Natural Gas Company, an affiliate of East Ohio. Inside
the Ohio boundary these interstate lines connect with
East Ohio's large high-pressure lines in which the im-
ported gas, propelled mainly by its own pressure, flows
continuously more than 100 miles to East Ohio's local
distribution systems. The combined length of these
high-pressure trunk lines is at least 650 miles.

That this continuous flow of gas from other states to
and through East Ohio's high-pressure lines constitutes
interstate transportation has been established by numer-
ous previous decisions of this Court. The gas does not
cease its interstate journey the instant it crosses the Ohio
boundary or enters East Ohio's pipes, even though that
Company operates completely within the state where the
gas is finally consumed. Respondents do not and cannot
claim that their gas is not in interstate commerce.[7] As
we held in *Interstate Natural Gas Co.* v. *Federal Power
Comm'n,* 331 U. S. 682, 688, the meaning of "interstate
commerce" in this Act is no more restricted than that

---

[6] 84 U. S. App. D. C. 312, 316, 173 F. 2d 429, 433.

[7] See, *e. g., Colorado-Wyoming Gas Co.* v. *Federal Power Com-
mission,* 324 U. S. 626; *Illinois Natural Gas Co.* v. *Central Ill. Pub.
Serv. Co.,* 314 U. S. 498, 503–4. See also *East Ohio Gas Co.* v. *Tax
Commission,* 283 U. S. 465, 470; *The Daniel Ball,* 10 Wall. 557.

which theretofore had been given to it in the opinions of this Court.

Respondents contend, however, that the word "transportation" in § 1 (b) must be construed as applying only to companies engaged in the business of transporting gas in interstate commerce for hire or for sales to be followed by resales, whereas East Ohio does neither. The short answer is that the Act's language did not express any such limitation. Despite the unqualified language of § 1 (b) making the Act apply to "transportation of natural gas in interstate commerce," respondents ask us to qualify that language by applying it only to businesses which both transport and sell natural gas for resale. They rely on a sentence in the declaration of policy, § 1 (a), referring to "the business of transporting and selling natural gas." But their contention that the word "and" in the policy provision creates an unseverable bond is completely refuted by the clearly disjunctive phrasing of § 1 (b) itself. As we pointed out in *Panhandle Eastern Pipe Line Co.* v. *Public Service Comm'n,* 332 U. S. 507, 516, § 1 (b) made the Natural Gas Act applicable to three separate things: "(1) the transportation of natural gas in interstate commerce; (2) its sale in interstate commerce for resale; and (3) natural gas companies engaged in such transportation or sale." And throughout the Act "transportation" and "sale" are viewed as separate subjects of regulation. They have independent and equally important places in the Act. Thus, to adopt respondents' construction would unduly restrict the Commission's power to carry out one of the major policies of the Act. Moreover, the initial interest of Congress in regulation of transportation facilities was reemphasized in 1942 by passage of an amendment to § 7 (c) of the Act broadening the Commission's powers over the construction or extension of pipe lines. 56 Stat. 83. This amendment followed a report of the Commission to Con-

gress pointing out that without amendment the Act vested the Commission with inadequate power to make "any serious effort to control the unplanned construction of natural-gas pipe lines with a view to conserving one of the country's valuable but exhaustible energy resources." [8] We hold that the word "transportation" like the phrase "interstate commerce" aptly describes the movements of gas in East Ohio's high-pressure pipe lines.[9]

Respondents also contend that East Ohio is exempt from the Act because all its facilities come within the proviso in § 1 (b) making the Act inapplicable "to the local distribution of natural gas or to the facilities used for such distribution." But what Congress must have meant by "facilities" for "local distribution" was equipment for distributing gas among consumers within a par-

---

[8] Federal Power Commission, Twentieth Annual Report (1940), p. 78. See Wheat, Administration by the Federal Power Commission of the Certificate Provisions of the Natural Gas Act, 14 Geo. Wash. L. Rev. 194, 197.

[9] In the *Pipe Line Cases*, 234 U. S. 548, 562, this Court held that the Uncle Sam Oil Company was not engaged in "transportation" of oil, within the statutory meaning of that word in the Interstate Commerce Act, where it was "simply drawing oil from its own wells across a state line to its own refinery for its own use, and that is all . . . ." This holding as to the meaning of transportation in the Interstate Commerce Act has slight force, if any, in determination of the word's meaning under this different and far more comprehensive Act. Furthermore, East Ohio is not merely moving gas for processing in its own plants. It buys and transports it for sale; there is no further processing of any kind, except for eventual reduction of pressure. This puts East Ohio's transportation more nearly in the category of that which we held to bring oil transportation within the coverage of the Interstate Commerce Act. *Valvoline Oil Co.* v. *United States*, 308 U. S. 141, 145; *Champlin Rfg. Co.* v. *United States*, 329 U. S. 29. In the latter case transported oil was to be sold in interstate commerce, while here the sale was to be made in intrastate commerce. This difference, however, is no persuasive reason why the special holding in the *Uncle Sam* case should be expanded to control our holding here.

ticular local community, not the high-pressure pipe lines transporting the gas to the local mains. For in decisions prior to enactment of the statute this Court had sharply distinguished between the two: it had made it clear that the national commerce power alone covered the high-pressure trunk lines to the point where pressure was reduced and the gas entered local mains, while the state alone could regulate the gas after it entered those mains.[10] The legislative history shows that the attention of Congress was directly focused on the cases drawing this distinction. It was because these cases had barred federal regulation of community supply systems that the Committee Report could correctly describe the "local distri-

---

[10] In both *Public Utilities Comm'n* v. *Landon*, 249 U. S. 236, 245, and *Pennsylvania Gas Co.* v. *Public Service Comm'n*, 252 U. S. 23, 28, this Court held that states could regulate retail sales of interstate gas to local consumers. In the *Landon* case the Court reasoned that state control of a local distributing company was permissible because "interstate movement ended when the gas passed into local mains." The *Pennsylvania Gas* decision, however, was based on a completely different line of reasoning. The Court held that the gas continued in interstate commerce until it reached the burner tips, but nevertheless permitted state regulation because retail sales presented a problem of local rather than national concern. In *Missouri* v. *Kansas Gas Co.*, 265 U. S. 298, 310, the Court resolved these conflicting doctrines by readopting the *Landon* rule. It limited the *Pennsylvania Gas* holding to its precise facts by interpreting that decision as resting solely on the *Landon* principle that states could regulate charges for service to local consumers. *Public Utilities Comm'n* v. *Attleboro Co.*, 273 U. S. 83, 89, reaffirmed this choice of doctrine, applying it to a company which like East Ohio transmitted its product (electricity) wholly within one state. In *East Ohio Gas Co.* v. *Tax Comm'n*, 283 U. S. 465, 470–472, the Court recognized that the doctrine of *Pennsylvania Gas* extending interstate commerce to the burner tips was in conflict with and must yield to the doctrine of the *Landon* and *Kansas Gas* cases. See note 13 *infra*. Thus when the Natural Gas Act was passed this Court's decisions had already resulted in a sharp cleavage between local distribution facilities and high-pressure pipe lines serving those facilities.

bution" proviso as surplusage which was "not actually necessary." [11]   We are wholly unpersuaded that Congress intended to treat trunk lines like East Ohio's as though they were mere integrated facilities of the numerous community supply systems which they service.   Indeed, as respondents admitted upon oral argument here, the logical consequence of such a principle would be that even a pipe line stretching from Texas to Cleveland would be completely exempt from the federal Commission's jurisdiction if it were owned by East Ohio.   To draw such a strained inference from the congressional exemption of local distribution systems would ignore the importance of nationally controlling interstate pipe lines in order to preserve "equality of opportunity and treatment among the various communities and States concerned." *Missouri* v. *Kansas Gas Co.*, 265 U. S. 298, 310.

What we have said indicates that East Ohio comes squarely within the coverage of the Act as set out in §§ 1 (b) and 2 (6).   Nevertheless respondents contend that this express coverage is restricted by the broad purpose of the Act to provide federal regulation only for those companies which states could not regulate.   Urging that all of East Ohio's business is fully subject to regulation by the state, they rely on statements by this Court that Congress intended not to cut down state regulatory power, but rather to supplement it by closing "the gap created by the prior decisions." *Panhandle Eastern Pipe Line Co.* v. *Public Service Comm'n,* 332 U. S. 507, 517–519; see also *Public Utilities Comm'n of Ohio* v.

---

[11] The Report stated that the proviso was "not actually necessary, as the matters specified therein could not be said fairly to be covered by the language affirmatively stating the jurisdiction of the Commission." H. R. Rep. No. 709, 75th Cong., 1st Sess., pp. 3–4. This could only mean that the phrase "interstate commerce" was construed by the Committee, as it had been by this Court, to exclude "local distribution."

*United Fuel Gas Co.,* 317 U. S. 456, 467. We adhere to those statements. But *prior* constitutional decisions, not what we have since decided or would decide today, form the measure of the gap which Congress intended to close by this Act. *Illinois Gas Co. v. Public Service Co.,* 314 U. S. 498, 508; and see *Parker* v. *Motor Boat Sales,* 314 U. S. 244, 250.

In a series of cases repeatedly called to the attention of the House Committee,[12] this Court had declared that states could regulate interstate gas only after it was reduced in pressure and entered a local distribution system. *Public Utilities Comm'n* v. *Landon,* 249 U. S. 236, 243; *Missouri* v. *Kansas Gas Co.,* 265 U. S. 298, 310; *Public Utilities Comm'n* v. *Attleboro Co.,* 273 U. S. 83, 89; and see *East Ohio Gas Co.* v. *Tax Comm'n,* 283 U. S. 465, 470–472.[13] Under these decisions state regulatory power could

---

[12] The record of the Committee hearings considering the proposed bill is crowded with repeated references to the cases discussed in note 10 *supra;* no other cases received such emphasis. The General Solicitor for the National Association of Railroad and Utilities Commissioners, for example, explained that the *East Ohio* case "established very clearly that a State has jurisdiction to regulate the business of distributing gas after it has been imported, and the pressure has been stepped down to permit of local distribution. It, however, leaves the State authorities still subject to the rule announced in the *Kansas case* . . . ." Hearings before the House Subcommittee of the Committee on Interstate and Foreign Commerce, 74th Cong., 2d Sess., 88. The Solicitor of the Federal Power Commission pointed out in his brief to the same committee that "The States cannot control the wholesale rates extracted for natural gas thus transported, nor may they regulate any other of the phases of the interstate transportation." *Id.,* 16. Amendments which would have specifically exempted from federal regulation all companies operating wholly within one state were proposed but rejected.

[13] See note 10 *supra.* The *East Ohio* case cited above concerned the question of whether the company was subject to state taxes. The tax doctrines involved are irrelevant here. Undeniably relevant, however, is the fact that Congress directly considered the doctrine

not reach high-pressure trunk lines and sales for resale. This was the "gap" which Congress intended to close. It therefore acted under the federal commerce power to regulate what these decisions had indicated that the states could not. We have already held that in so doing Congress subjected to federal regulation a company transporting interstate gas, and selling it for resale, wholly within one state. *Illinois Gas Co.* v. *Public Service Co.,* 314 U. S. 498.[14] The only respect in which East Ohio differs from that company is that it sells gas direct to consumers rather than for resale. This difference is immaterial. For as we have already pointed out, East Ohio comes directly within the express provision granting power to the Commission to regulate "transportation of natural gas in interstate commerce," just as the Illinois company came directly within the express provision covering sale for resale. And in the light of the *Illinois Gas* decision we cannot see how the "local distribution" proviso can be construed as encompassing all of East Ohio's operations throughout the state. That proviso cannot mean one thing for "transportation" and another where "sale for resale" is involved.

Here as elsewhere, once a company is properly found to be a "natural-gas company," no state can interfere with federal regulation. That a state commission might also have some regulatory power would not pre-

---

of interstate commerce enunciated in that case: that transportation of out-of-state gas to the local systems "is essentially national—not local—in character and is interstate commerce within as well as without that State." 283 U. S. 465, 470.

[14] There are implications in the Court's opinion that under prevailing constitutional doctrine a state might now, in the absence of federal legislation, regulate such a company as Illinois Gas or East Ohio. See *Illinois Gas Co.* v. *Public Service Co.,* 314 U. S. 498, 504, discussed in *Panhandle Eastern Pipe Line Co.* v. *Public Service Comm'n,* 332 U. S. 507, 512. But compare *Hood & Sons* v. *Du Mond,* 336 U. S. 525, 545.

clude exercise of the Commission's function. *Connecticut Light & Power Co.* v. *Federal Power Comm'n,* 324 U. S. 515, 533; *Public Utilities Comm'n* v. *Attleboro Co.,* 273 U. S. 83, 89–90. Nor does the Act purport to abolish all overlapping. Section 5 (b), for example, provides that the Commission may "investigate and determine the cost of the production or transportation of natural gas by a natural-gas company in cases where the Commission has no authority to establish a rate governing the transportation or sale of such natural gas." 52 Stat. 824. Yet clearly the state agency establishing such a rate would have equivalent authority.

We find no language in the Act indicating that Congress meant to create an exception for every company transporting interstate gas in only one state. Regardless of whether it might have been wiser and more farseeing statesmanship for Congress to have made such an exception, we should not do so through the interpretative process. There is nothing in the legislative history which authorizes us to interpret away the plain congressional mandate.

## II.

A contention not passed on by the Court of Appeals but urged here by respondents, is that compliance with the Commission's accounting and report orders would impose so great a burden on East Ohio "as to make such orders transgress statutory and federal constitutional limits." Our attention is not specifically referred to anything in the record showing that the Commission has required East Ohio to adopt any particular accounting method or make any particular report not reasonably related to the Commission's granted powers in this respect.[15] Nor did the

[15] The orders here primarily rest on Commission regulations pursuant to the following sections. Section 6 (b) authorizes the Commission to require a natural-gas company to file "an inventory of all

Commission fail to make proper findings to support its order. All of the Commission requirements affirmatively appear to call for the precise kind of accounting system, information, and reports that Congress deemed relevant and necessary for the Commission to have in performing its regulatory duties. The principles of law governing such requirements were adequately set out by Mr. Justice Cardozo speaking for the Court in *American Telephone & Telegraph Co.* v. *United States,* 299 U. S. 232. See also *Northwestern Electric Co.* v. *Federal Power Comm'n,* 321 U. S. 119. Measured by these criteria for judicial review of such orders, we find no reason to reject the Commission's findings that the orders here issued were necessary and proper as applied to East Ohio. And as to the cost of compliance, it is sufficient to say as the Court said in the *American Telephone & Telegraph* case, *supra,* p. 247: "The evidence does not show that the expense . . . will lay so heavy a burden upon the companies as to overpass the bounds of reason." [16]

---

or any part of its property and a statement of the original cost thereof, and . . . keep the Commission informed regarding the cost of all additions, betterments, extensions, and new construction." 52 Stat. 824, 15 U. S. C. § 717e (b). Section 8 (a) makes it the duty of such companies to keep "such accounts, records of cost-accounting procedures," etc., as the Commission may by rules and regulations prescribe. Section 10 (a) similarly requires "annual and other periodic or special reports." Section 5 (b) authorizes the Commission to "investigate and determine the cost of the . . . transportation of natural gas by a natural-gas company" even where the Commission has no authority to establish rates for the transportation or sale of that gas. Section 16 vests the Commission with broad powers to prescribe general orders, rules and regulations found "necessary or appropriate to carry out the provisions of this Act."

[16] The Commission found that East Ohio's estimate placing the cost of compliance at between $1,500,000 and $2,000,000 was "not convincing, for our experience with other companies with greater property investment indicates that this estimate is considerably exaggerated." 74 P. U. R. (N. S.) 256, 263.

The contention that the Commission's order violates the reserved rights of the states under the Tenth Amendment is foreclosed by the Court's holding in *Northwestern Electric Co.* v. *Federal Power Comm'n, supra,* at 125. Section 8 (a) of the Natural Gas Act itself provides that "nothing in this Act shall relieve any such natural-gas company from keeping any accounts, memoranda, or records which such natural-gas company may be required to keep by or under authority of the laws of any State."

The Commission's order is valid and should be enforced.

*Reversed.*

MR. JUSTICE DOUGLAS and MR. JUSTICE BURTON took no part in the consideration or decision of this case.

MR. JUSTICE JACKSON, whom MR. JUSTICE FRANKFURTER joins, dissenting.

If this were a case of applying an explicit policy of Congress to one recalcitrant gas company, there would of course be no dissent. But if it were such, we would not be likely to find the State of Ohio and her Utility Commission, the National Association of Railroad and Utility Commissioners, and public authorities of several states, including some with notable records for protecting the public interest, here helping the utility. This alliance of state authorities against the Federal Power Commission suggests that there must be more to this case than meets the eye.

The key to an understanding of the Federal Natural Gas Act is its purpose to supplement but not to supplant state regulation. Before passage of the Act, each state was able to regulate the ultimate price of natural gas distributed to its consumers. *Pennsylvania Gas Co.* v. *Public Service Comm'n,* 252 U. S. 23. This Court has never denied any state that power. But in doing so they were obliged to allow as operating costs what the distributing

company paid for the gas when brought into its system from out of the state. This purchase price the state could not regulate, often not even investigate, and the purchases frequently were from affiliates, a fact which might cool the local company's normal zeal to drive a good bargain for itself and its consumers. Hence, the states appealed to Congress to set up machinery to fix the import price of out-of-state gas. This was all that the states asked the Federal Government to do, and it is everything that the Federal Power Commission revealed any purpose to do while the legislation was pending. Its Solicitor summarized the purposes before a subcommittee of the House Committee on Interstate and Foreign Commerce, as follows: "The whole purpose of this bill is to bring under Federal regulation the pipe lines and to leave to the State commissions control over distributing companies and over their rates, whether that gas moves in interstate commerce or not." Hearings Before a Subcommittee of the House Committee on Interstate and Foreign Commerce on H. R. 11662, 74th Cong., 2d Sess., 24. That is what the state authorities active in promoting the legislation seem to have believed had been accomplished.

East Ohio is an all-Ohio company, deriving income solely from distributing gas directly to Ohio consumers. It sells no gas for resale. All of its assets are located and all of its business is transacted in Ohio. Since 1911, the Ohio State Commission has exercised regulatory powers over it which have included rate-making, authorizing acquisition of sale of property, approval of capitalization and security issues, complete control of accounting practices and requiring detailed periodic reports. Except for inability to fix the price at which gas should be delivered to the company at the state line, Ohio is able to supervise and regulate this utility completely and continuously.

The Federal Power Commission, as authorized by the Act, fixed the state-line price that East Ohio must pay

for its out-of-state supplies. But now it seeks to go beyond this and superimpose some features of its regulation which conflict with the regulation of the identical subject matter by the State of Ohio. How much farther than the order here under review the Commission will go in supplanting or duplicating state regulation is not clear from its argument, and how far it can go is rendered unclear by the Court's opinion which expressly approves some overlapping but leaves its bounds in carefully stated doubt. The anxiety which this program stirs among other states is explained by its magnitude. The Power Commission in its petition here notes forty-three pending cases in which it takes this same position *vis-à-vis* state regulation.

It appears that the present particular issue arises because the Commission has theories of accounting different from those the state has seen fit to accept. The Federal Commission has ordered East Ohio to change its entire accounting system for all of its properties at a very heavy cost. This requires it either to conduct its accounting contrary to laws of Ohio and the orders of the State Commission or perhaps to keep two sets of books. This is a real conflict in which experience shows state control will wither away and leave the federal rule in possession of the field.

This Court can sustain such overlapping and overriding of the state's authority only by repudiating its own recent statements. After reviewing the history of the Natural Gas Act, we have said that "Congress meant to create a comprehensive scheme of regulation which would be complementary in its operation to that of the states, without any confusion of functions." *Public Utilities Comm'n* v. *United Fuel Gas Co.*, 317 U. S. 456, 467. In a later case, quoting H. R. Rep. No. 709, 75th Cong., 1st Sess., we said that "the bill was designed to take 'no authority from State commissions' and was 'so drawn as

to complement and in no manner usurp State regulatory authority.' " *Federal Power Comm'n* v. *Hope Natural Gas Co.,* 320 U. S. 591, 610. Quoting the same House Report, we thereafter pointed out that "the 'basic purpose' of Congress in passing the Natural Gas Act was 'to occupy this field in which the Supreme Court has held that the States may not act.' " *Interstate Natural Gas Co.* v. *Federal Power Comm'n,* 331 U. S. 682, 690. And only last year we observed that, "The Natural Gas Act was designed to supplement state power and to produce a harmonious and comprehensive regulation of the industry. Neither state nor federal regulatory body was to encroach upon the jurisdiction of the other." *Federal Power Comm'n* v. *Panhandle Eastern Pipe Line Co.,* 337 U. S. 498, 513.

What defines the point beyond which the provisions of the Act shall not apply? The Court suggests that there is an inherent limitation on the affirmative grant of power which would render surplusage the clause in § 1 (b) denying application of the Act to "the local distribution of natural gas or to the facilities used for such distribution." Or it may be this exclusionary clause itself. At any rate, the Court finds the dividing line of jurisdiction to be drawn by physical characteristics of the transmission lines. It seizes upon the point where the high pressure at which gas is transmitted any substantial distance is reduced to the low pressure at which it must be served to customers' burners through the community supply lines as the outer limit of the "local" area reserved to the states.

Recognizing the purpose of the Federal Natural Gas Act of June 21, 1938, to regulate only that which was unregulated and unregulatable by the states, the Court assumes that decisions *prior* to its passage, "not what we have since decided or would decide today," fix the states' power for the purposes of measuring that of the Commis-

sion. The Court has heretofore followed the principle that Congress does not intend to freeze the impact of its legislation within current judicial decisions in the absence of evidence which makes such intention unmistakable. *United States* v. *South-Eastern Underwriters Assn.,* 322 U. S. 533. But today it makes no effort to look for evidence of such an intention and had it searched it would not have found it. *Cf. Helvering* v. *Griffiths,* 318 U. S. 371; *Parker* v. *Motor Boat Sales,* 314 U. S. 244.

Today's anomalous result whereby the Commission is given regulatory power over the intrastate distribution facilities of a gas company over whose sales it admittedly has no jurisdiction is based upon the premise that paramount in Congress' mind in dealing with cases prior to passage of the Act, was, not the holdings of applicable cases relating to regulation, but the peculiarly mechanistic formula employed principally in 1931 in *East Ohio Gas Co.* v. *Tax Comm'n,* 283 U. S. 465,[1] as a means of holding that the State of Ohio could levy an excise tax based on the entire gross receipts from sales to local consumers by an interstate gas company.

I find no convincing indication, either in the language of the Act or in its legislative history, that Congress intended that we should be forever bound, in construing this legislation, either by the then current decisions as to limitations of the Commerce Clause on state power, *cf. United States* v. *South-Eastern Underwriters Assn., supra,* or by the then current criteria of what separated local from nonlocal facilities. The crucial question is not whether this Court in 1931 would have held a given

---

[1] In the *East Ohio* tax case the reduction of pressure and expansion of volume of the gas at the point of entrance into local supply mains was compared to the breaking of an original package after shipment in interstate commerce, so that its contents could be treated, prepared for sale and sold at retail.

factual situation without the area of local distribution and beyond the reach of state regulation, but whether this Court today can say that the federal power can be exerted because the state power cannot be exerted. So long as we pay even lip service to Congress' intention to leave to the states that which they can regulate, we cannot satisfactorily beg this question.

But even if the Court is to shift to the doctrine that Congress casts its Acts forever in the mold made by prior decisions of this Court, the pressure-reduction station now relied upon to limit "local" had lost its standing even in tax cases and never was accepted in regulation cases. If Congress was interested in tax case criteria when it passed the Natural Gas Act, it must have known of this Court's disdainful disregard of pressure changes in favor of emphasis on the difference between wholesale and retail distribution less than half a year after the *East Ohio* tax decision. *State Tax Comm'n* v. *Interstate Natural Gas Co.,* 284 U. S. 41.[2]

And yet, although the Committee Reports and the records of congressional debates on the Natural Gas Act may be scanned in vain for any mention of this pressure-reduc-

---

[2] The question before the Court concerned the power of the State of Mississippi to tax wholesale operations of an interstate pipe-line company. Curtly dismissing the State's arguments resting on the fact that the gas pressure had been reduced before the sale for resale, the Court held, as succinctly stated in the headnote: "The selling of gas wholesale to local, independent distributors from a supply passing into and through the State in interstate commerce, does not become a local affair and subject to a local privilege tax merely because the vendor, to deliver the quantities sold, uses a thermometer and a meter and reduces the pressure." In its argument to the Court, 284 U. S. at p. 42, the State had presented the analogy of pressure reduction to the breaking of an original package shipped in interstate commerce, *cf.* note 1, *supra*. *State Tax Comm'n* v. *Interstate Natural Gas Co.,* 284 U. S. 41.

tion point, we are now asked to believe that Congress fixed it as the point where state control should end and federal control should begin. With this approach, today's decision confines the states' regulatory power to the service area, bounded by the low-pressure transmission system, which means practically within the city gates. By its emphasis on this pressure change the Court finds a plain congressional grant of Commission jurisdiction over high-pressure pipe lines such as those of East Ohio. However, this pressure factor is one which we found immaterial in *Interstate Natural Gas Co.* v. *Federal Power Comm'n, supra,* 689, where, with rare unanimity, we put our emphasis upon the fact of sale for resale in interstate commerce. But today it is the difference between retail and wholesale operations which is termed immaterial, so long as the factor of high-pressure pipe lines is present.

This shift in emphasis rests upon inferences drawn from the legislative history of the Natural Gas Act which are wholly inconsistent with those drawn in our prior decisions examining the subject. Heretofore we have been careful consistently to observe that Congress did not attempt to occupy the entire field within the limits of its constitutional power, and until today we have insisted that in extending federal regulation Congress "was meticulous to take in only territory which this Court had held the states could not reach." *Panhandle Eastern Pipe Line Co.* v. *Comm'n,* 332 U. S. 507, 519. We said only two years ago in that case that "by 1938 the Court had delineated broadly between the area of permissible state control and that in which the states could not intrude. The former included interstate direct sales to local consumers, as exemplified in *Pennsylvania Gas Co.* v. *Public Service Comm'n,* 252 U. S. 23; the latter, service interstate to local distributing companies for re-

sale, as held in *Missouri* v. *Kansas Gas Co.,* 265 U. S. 298, reinforced by *Public Utilities Comm'n* v. *Attleboro Co.,* 273 U. S. 83." And we went on to say that the purpose of the legislation was to make state regulation effective "by adding the weight of federal regulation to supplement and reinforce it in the gap created by the prior decisions." *Id.,* pp. 514, 517. And see *Interstate Natural Gas Co.* v. *Federal Power Comm'n,* 331 U. S. 682, 689; also, *Federal Power Comm'n* v. *Hope Natural Gas Co.,* 320 U. S. 591, 609, quoting from *Illinois Natural Gas Co.* v. *Public Service Co.,* 314 U. S. 498, 506. We could hardly have said more clearly that the "gap" was in the wholesale realm of the natural-gas industry in interstate commerce.

The Court's opinion professes to adhere to these statements relating to the gap Congress intended to close. But it first widens the gap, squarely upon the premise that, under decisions of this Court called to Congress' attention prior to passage of the Act, the state regulatory power could not reach transmission lines for interstate gas outside the point of reduction in pressure. Actually, no decision could have been called to the attention of Congress, and none is or can be cited today, in which this Court held that any of the intrastate transmission lines of any retail gas, electric or similar company, within or without the pressure-reduction point, were beyond the state regulatory authority. Nor was this question even at issue in any case cited by the Court in support of its premise. That is not to say that the question was not considered, however. Quite to the contrary, less than two months before passage of the Natural Gas Act, this Court, through the pen of Mr. Chief Justice Hughes, in a case not cited by the Court, declared that such transmission lines were properly within the sphere of state rate-making powers. *Lone Star Gas Co.* v. *Texas,* 304

U. S. 224.[3]  And so if Congress were consulting the decisions of this Court to define the gap in state power, which it must fill with the Commission's function, it found the latest, and all but unanimous one, to declare that no gap such as the Court perceives today was then existent.

Although the scope of the Natural Gas Act was not limited to sales of natural gas in interstate commerce for resale, it must be recognized that, if any one thing is clear from the legislative history of this Act, it is that Congress' paramount concern was to establish regulation of such prices.[4]  And it must likewise be recognized that what-

[3] In the *Lone Star* case this Court examined the validity of an order of a Texas commission fixing the rate to be charged by the Lone Star company for gas sold to local distributing companies at the gates of numerous Texas communities.  Most of the Lone Star gas was piped from fields in the Texas Panhandle, but across a segment of Oklahoma.  A small amount was produced or purchased in Oklahoma, piped into Texas, treated, and added to the local supply.  Thus commingled beyond separate recognition, both types of gas were conducted through high-pressure lines and sold to the various retail distributing companies.  Because of the interrelated corporate structure of Lone Star and these distributing companies, the Court treated them as one operating unit, and approved the state's exercise of its rate-making power based upon valuation of the entire integrated system.

[4] H. R. Rep. No. 709, 75th Cong., 1st Sess. 1–2, adopted without change in S. Rep. No. 1162, 75th Cong., 1st Sess. 1–2, said of the proposed bill which became the Natural Gas Act: ". . . The States have, of course, for many years regulated sales of natural gas to consumers in intrastate transactions.  The States have also been able to regulate sales to consumers even though such sales are in interstate commerce, such sales being considered local in character and in the absence of congressional prohibition subject to State regulation. (See *Pennsylvania Gas Co.* v. *Public Service Commission* (1920), 252 U. S. 23.)  There is no intention in enacting the present legislation to disturb the States in their exercise of such jurisdiction.  However, in the case of sales for resale, or so-called wholesale sales, in interstate commerce (for example, sales by producing companies to distributing companies) the legal situation is different.  Such transactions have been considered to be not local in character and, even

ever of our old doctrines may have been frozen into the Act · could not include the point of pressure reduction and entrance into municipal lines as the measure of state regulatory authority, for no such doctrine can be found in our cases.

Thus it is apparent that in selecting the point to mark either the inherent limitation in the Act's affirmative grant of power to the Commission, or the corollary limit imposed by the clause excluding facilities used in local distribution, the Court has resorted to criteria neither

in the absence of Congressional action, not subject to State regulation. (See *Missouri* v. *Kansas Gas Co.* (1924), 265 U. S. 298, and *Public Service Commission* v. *Attleboro Steam & Electric Co.* (1927) 273 U. S. 83.) The basic purpose of the present legislation is to occupy this field in which the Supreme Court has held that the States may not act."

Congressional debates on the bill were similarly concerned with those aspects of the natural gas industry over which no state regulatory control existed. These debates were led, in the House, by Chairman Lea of the Committee on Interstate and Foreign Commerce, and, in the Senate, by Chairman Wheeler of the Committee on Interstate Commerce. In his explanatory statement the former declared, "The primary purpose of the pending bill is to provide Federal regulation, in those cases where the State commissions lack authority, under the interstate-commerce law. This bill takes nothing from the State commissions; they retain all the State power they have at the present time." 81 Cong. Rec. 6721. And he added later, "The object of this bill is to supply regulation in those cases where the State commission has no power to regulate." *Ibid.* Committee member Halleck assured the House that "this bill seeks only to reach those sales where the sale is for resale to the ultimate consumer." *Id.*, 6723. And in the Senate, Chairman Wheeler declared: "There is no attempt and can be no attempt under the provisions of the bill to regulate anything in the field except where it is not regulated at the present time. It applies only as to interstate commerce and only to the wholesale price of gas." 81 Cong. Rec. 9313.

Neither the *East Ohio* case nor its mechanistic formula was emphasized or even adverted to in the Committee Reports or in the congressional debates.

supportable by this Court's decisions prior to the Act nor even claimed to be consistent with its most recent doctrines.

But if the pressure-reduction point cannot be resurrected from the *East Ohio* tax case to bound the facilities used in the local distribution of natural gas in interstate commerce, what criteria can we employ? It is not as though a simple, unsophisticated answer were not available. It seems to me that the obvious answer is that intrastate transmission lines of a retail gas company devoted exclusively to serving communities within the state are facilities used in the local distribution of natural gas and are accordingly excepted from application of the Act. For it must not be forgotten that if justification for today's decision cannot be found in § 1 (b) of the Act, it cannot be established by resort to the language of those sections defining the Commission's powers. For § 1 (b) is jurisdictional. It sets forth the areas to which the provisions of the Act shall and shall not apply. Its "but" clause was Congress' assurance to the state bodies sponsoring the legislation that federal control would not extend to the area within their authority. *Cf. Connecticut Light & Power Co.* v. *Federal Power Comm'n,* 324 U. S. 515, 527.

This simple solution squares not only with modern standards, but also with the approach, if it is to be adopted, that Congress in passing this Act froze into law current judicial decisions. It keeps faith with the states. It is decidedly consistent with our recent declaration under the almost identical words of a similar Act that limitation of local facilities was not to be found in the *East Ohio* tax formula, and that even the transmission lines of a state-wide system supplying electric power to consumers in over a hundred communities are "facilities used in local distribution." *Connecticut Light & Power Co.* v. *Federal Power Comm'n, supra.*

Of course, this solution does not render meaningless the "transportation of natural gas in interstate commerce" to which the provisions of the Act apply. For instance it would logically enough give to the Federal Power Commission, under the above "transportation clause," exclusive jurisdiction over the main transmission lines of a retail gas company which ran through Ohio and on into New York; but it would leave to Ohio exclusive jurisdiction over lateral lines branching out from the main trunk in Ohio and, whether one or one hundred miles long, devoted exclusively to delivering gas to the burner tips in Ohio communities. Similarly, under the hypothesis constructed in the Court's opinion, wherein East Ohio is pictured as having its own transmission lines extending all the way from Texas, it would give exclusively to the Power Commission jurisdiction over those lines beyond the Ohio border as well as over those within or without the state not devoted exclusively to serving Ohio consumers at retail. Again, it would, quite obviously within the words of the Act, give exclusively to the Power Commission jurisdiction over companies which might act in the nature of common carriers transporting gas in interstate commerce for hire. In short it would give to the transportation clause a meaning which, contrary to today's opinion, does not render surplusage the "sale in interstate commerce of natural gas for resale" to which the provisions also apply.[5]

---

[5] The suggested construction also comports with the conclusions of the House and Senate Committee reports, H. R. Rep. No. 709, 75th Cong., 1st Sess. 3, and S. Rep. No. 1162, 75th Cong., 1st Sess. 3: "That part of the negative declaration stating that the act shall not apply to 'the local distribution of natural gas' is surplusage by reason of the fact that distribution is made only to consumers in connection with sales, and since no jurisdiction is given to the Commission to regulate sales to consumers the Commission would have no authority over distribution, whether or not local in character."

What the Power Commission asks the Court to do today is not to fill a gap in the state's power to regulate, for there is none, but to create a gap in order to make room for federal power.

I can well understand the zeal of the Federal Power Commission to expand its control over the natural gas industry. It sprawls over many states and each system must be physically integrated from the depths of the wells to the consumer's burner tips. Its regulation cannot be uniform if the Federal Commission controls only a middle segment, with production on one end and distribution on the other committed to the control of different states. But that was as far as Congress was willing to supersede state authority. It left the peculiar problems affecting production to the producing states, it left the ultimate protection of consumers to the consuming states, and it left the Federal Power Commission in the middle to fix the rates for gas moving between the two. This obviously subdivides regulation of what has to operate as a unitary enterprise, but that is often the consequence of our federal system. Whatever we may think would be wise policy in this field, the Act which Congress passed places limitations upon the Power Commission, which may chafe but which neither we nor the Commission are free to override. If the Commission had foreshadowed its present course, I do not suppose the Act would have passed, for it certainly would have evoked resistance of the state regulatory agencies instead of their support.

Congress may well have believed that diversity of experimentation in the field of regulation has values which centralization and uniformity destroy. As Mr. Justice Brandeis said, "It is one of the happy incidents of the federal system that a single courageous State may, if its citizens choose, serve as a laboratory; and try novel social and economic experiments without risk to the rest of the country." *New State Ice Co.* v.

*Liebmann,* 285 U. S. 262, 311. Long before the Federal Government could be stirred to regulate utilities, courageous states took the initiative and almost the whole body of utility practice has resulted from their experiences.

We must not forget that regulatory measures are temporary expedients, not eternal verities—if indeed they are verities at all. Certainly one of the matters on which the states might well be indulged—the right to an opinion of their own—is as to the accounting methods of a utility whose whole property and business being accounted for is within the state. Out of their diversity of practice and experience emerge pragmatic tests. What the Federal Power Commission seeks to require of this Ohio gas company, for example, is to revert by accounting methods to emphasis on original cost, a basis which William Jennings Bryan for an earlier generation of progressives eloquently urged this Court to reject in the field of railroad rate-making. *Smyth* v. *Ames,* 169 U. S. 466. See Mr. Bryan's argument, p. 489. That is a basis of which, last month, we said in another connection, "Original cost is well termed the 'false standard of the past' where, as here, present market value in no way reflects that cost." *United States* v. *Toronto Navigation Co.,* 338 U. S. 396, 403. It must be remembered that closer than any federal agency to those they regulate and to their customers are the state authorities, whose mechanisms are less cumbersome and whose principles can much more quickly be adjusted to the changing times.

We should not utilize the centralizing powers of the federal judiciary to destroy diversities between states which Congress has been scrupulous to protect. If now and then some state does not regulate its utilities according to the federal standard, it may be a small price to pay for preserving the state initiative which gave us utilities regulation far in advance of federal initiative.

I think that observance of good faith with the states requires that we interpret this Act as it was represented at the time they urged its enactment, as its terms read, and as we have, until today, declared it, *viz.* to supplement but not to supplant state regulation. What amounts to an entrapment of the state agencies that supported this Act under the representation that it would not deprive them of powers but would only make their powers effective will probably not make it easier to get needed regulatory legislation in the future.