827 F.2d 779
 264 U.S.App.D.C. 128
 NORTHERN NATURAL GAS COMPANY, DIVISION OF INTERNORTH, INC., Petitioner,
v.
FEDERAL ENERGY REGULATORY COMMISSION, Respondent,
Michigan Power Company, Northern States Power Company, et
al., Process Gas Consumers Group, Energy Issues
Intervention Office of the Minnesota
Department of Public Service,
Intervenors.
NORTHERN NATURAL GAS COMPANY, DIVISION OF INTERNORTH, INC., Petitioner,
v.
FEDERAL ENERGY REGULATORY COMMISSION, Respondent.
 Nos. 84-1516, 85-1045.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued En Banc Dec. 2, 1986.
Decided Aug. 21, 1987.
 
 Petitions for Review of Orders of the Federal Energy Regulatory commission.
 David B. Ward, Washington, D.C., with whom Henry C. Rosenthal, Jr., Omaha, Neb., and Allan W. Anderson, Jr., Washington, D.C., were on the brief for petitioner in Nos. 84-1516 and 85-1045.
 Joel Cockrell, Atty., F.E.R.C., with whom Jerome M. Feit, Sol., F.E.R.C., Washington, D.C., was on the brief for respondent in Nos. 84-1516 and 85-1045.
 Christopher K. Sandberg, St. Paul, Minn., for intervenor, Minnesota Dept. of Public Service in Nos. 84-1516 and 85-1045.
 William T. Miller and Susan N. Kelly, Washington, D.C., entered appearances for intervenor, Northern States Power Company in Nos. 84-1516 and 85-1045.
 Edward J. Brady entered an appearance for Michigan Power Co., intervenor in No. 84-1516.
 Edward J. Grenier and Glen S. Howard, Washington, D.C., entered appearances for Process Gas Consumers Group, intervenor in No. 84-1516.
 Thomas C. Gorak, on the brief, for Md. People's Counsel, amicus curiae in Nos. 84-1516 and 85-1045.
 Before WALD, Chief Judge, MIKVA, EDWARDS, RUTH BADER GINSBURG, BORK, STARR, SILBERMAN, BUCKLEY, WILLIAMS and D.H. GINSBURG, Circuit Judges.
 Opinion for the Court filed by Circuit Judge D.H. GINSBURG.
 Dissenting opinion filed by Chief Judge WALD, with whom Circuit Judge MIKVA joins.
 D.H. GINSBURG, Circuit Judge:
 
 
 1
 In this case, we are asked to determine whether the Federal Energy Regulatory Commission (Commission), in issuing a certificate of public convenience and necessity to Northern Natural Gas (Northern) for a proposed discount resale service, exceeded the authority granted it by section 7 of the Natural Gas Act of 1938[1] (the "Act") to impose "reasonable terms and conditions" upon such certificates. Specifically, we must decide whether the Commission lawfully imposed upon the certificate the condition that Northern credit fixed-cost related revenues from its proposed discount resale service to the customers of its existing non-discount resale service, with the aim of lowering the portion of shared fixed costs that those non-discount customers must bear.
 
 
 2
 Applying this court's holding in Panhandle Eastern Pipe Line Co. v. FERC, 613 F.2d 1120 (D.C.Cir.1979), cert. denied, 449 U.S. 889, 101 S.Ct. 247, 66 L.Ed.2d 115 (1980), in which we found a similar condition unlawful in light of sections 4 and 5 of the Act,[2] the panel in this case invalidated the revenue-crediting condition. Northern Natural Gas v. FERC, 780 F.2d 59, rehearing granted and opinion vacated in part, 780 F.2d 64 (D.C.Cir.1985). Although constrained to follow Panhandle, the panel nevertheless indicated some doubt whether that case was properly decided. Upon motions of the Commission and an intervenor,[3] the court en banc voted to grant rehearing on the question "whether this Court should continue to adhere to [the] decision in [Panhandle ], and, if not, in what respects it should depart therefrom." Accordingly, we vacated Part II and the last paragraph of the panel's opinion.
 
 
 3
 After reviewing the Act and interpretive case law from this court and the Supreme Court, we now reaffirm Panhandle and hold that the revenue-crediting condition that the Commission imposed in this case is unlawful for the reasons given in that decision.
 
 
 4
 I. THE Panhandle DECISION AND THE Northern PANEL OPINION
 
 
 5
 To understand the holding in Panhandle, we must review the relevant provisions from the Act; in doing so, we may rely upon the following discussion in Panhandle itself:
 
 
 6
 Three interrelated sections constitute the "comprehensive and effective regulatory scheme" Congress created with regard to ratemaking. Section 7 provides that to undertake the "transportation or sale of natural gas," an entity must first obtain "a certificate of public convenience and necessity issued by the Commission." In issuing such certificates, the Commission has "the power to attach ... such reasonable terms and conditions as the public convenience and necessity may require." Once rates are authorized under section 7, a natural gas company may file for an increase under section 4. The company must file its rates thirty days before they go into effect. The Commission may then suspend the new rate schedule for five months. Thereafter the increased rates may be collected but the Commission may require a bond to ensure refunds of "increased rates or charges by its decision found not justified." The burden of proof in section 4 proceedings is on the natural gas company.
 
 
 7
 On the other hand, if rates are unjust or unreasonable, the Commission may adjust them pursuant to section 5. This section provides that "[w]henever the Commission, after a hearing ... shall find that any rate ... is unjust, unreasonable, unduly discriminatory, or preferential, the Commission shall determine the just and reasonable rate ... and shall fix the same by order." Section 5 rate adjustments may be prospective only, and the Commission may not order rate increases unless the company has filed a new rate schedule.
 
 613 F.2d at 1127-28 (citations omitted).[4]
 
 8
 In Panhandle, this court held that the Commission exceeded its conditioning authority in imposing a revenue-crediting condition similar to that in the instant case. The panel opinion in this case summarized the Panhandle decision as follows:
 
 
 9
 In [Panhandle ], we reviewed the Commission's attachment of a similar condition to a pipeline's application for a Section 7 certificate authorizing it to use idle system capacity to transport another company's natural gas. Because the pipeline's existing gas rates had been set at levels deemed sufficient to compensate the pipeline for its costs, the Commission believed that any revenues received from the transportation service would constitute a double recovery. The Commission therefore attached to its authorization a condition requiring the pipeline to reduce the rates of its gas customers by crediting all transportation revenues to costs borne by them. In passing upon the validity of this condition, we acknowledged that the Commission is empowered by the NGA, Sec. 7(e), 15 U.S.C. Sec. 717f(e), to "attach to the issuance of the certificate ... such reasonable terms and conditions as the public convenience and necessity may require," including a rate ceiling for the new service, see, e.g., Atlantic Refining Co. v. Public Service Commission, 360 U.S. 378, 79 S.Ct. 1246, 3 L.Ed.2d 1312 (1959). We concluded, however, that there was a fundamental distinction between imposing conditions on the terms of the proposed service itself and imposing conditions on the terms of services not directly before the Commission in the Section 7 certification proceeding. To permit the latter, we felt, would expand Section 7 beyond its intended purpose, into a means of circumventing the protections afforded to pipelines under the NGA's normal rate-adjustment provisions, Sections 4 and 5, 15 U.S.C. Secs. 717c, 717d. Panhandle, 613 F.2d at 1129-33. Accordingly, we held that "[t]he Commission may not ... order adjustments in previously approved rates for services not before it in the certificate proceeding." Id. at 1133.
 
 
 10
 780 F.2d at 61-62.
 
 
 11
 The Panhandle court had offered three reasons for why it concluded that the Commission's broad interpretation of its authority to impose the revenue-crediting condition was "unreasonable" (613 F.2d at 1126):
 
 
 12
 (1) if the Commission could use section 7 for this purpose, then "[s]ection 5 would be reduced to a stopgap device, necessary for reducing unjust or unreasonable rates only when no new certificate filings were being made. We do not think that section 7 was meant to reduce so sharply the role of section 5, and therefore decline to adopt FERC's expansive interpretation of the conditioning power." 613 F.2d at 1129 (footnote omitted);
 
 
 13
 (2) the rate-setting provisions in sections 4 and 5 were designed to protect against regulatory lag and rate instability; if the Commission could use section 7 to lower existing rates, then "[r]ate stability is destroyed ... [and] [p]rotections against revenue loss caused by administrative delay are seriously diluted." Id. at 1129-30; and
 
 
 14
 (3) if the Commission could lower rates for previously certificated services through imposing section 7 conditions, then it could avoid the section 5 requirements that a hearing be afforded and that it find that the existing rates are not "just and reasonable." Id. at 1130.
 
 
 15
 In the instant case, the panel was confronted with a similar revenue-crediting condition, and had to decide whether that condition violated the rule announced in Panhandle. Of relevance here are the following facts as set forth in the panel's opinion:
 
 
 16
 In April of 1983, the Commission approved an uncontested [section 4] settlement establishing Northern's general rate structure for natural gas sales. Since that time suppliers of alternate fuels in Northern's market area have priced their products at rates that are, for equivalent quantities of energy, below those provided in the settlement. Because many large-scale gas consumers have the capacity to switch to alternate fuels, Northern faces a potentially large loss of sales volume.
 
 
 17
 To meet this problem, Northern sought from the Commission a certificate of public convenience and necessity, authorizing it to sell natural gas at discounted (i.e., below-settlement) rates to its customers who possess alternate fuel capacity. Under the "flexible pricing schedules" that it proposed, these discount rates would recover all of the variable costs associated with the quantity of gas sold, but less than all of the fixed costs....
 
 
 18
 ... [In reviewing Northern's certificate application, the] Commission noted that, for the most part, non-discount customers would be helped by Northern's program only in the future, and expressed the view that they were entitled to a "more immediate benefit." In addition, the Commission apparently believed that Northern's revenues from non-discount customers would fully cover fixed costs, wherefore any recovery of fixed costs from discount sales would constitute a "windfall." The Commission therefore added a ... condition to the certificate [that] Northern would be required to credit all recovery of fixed costs from discount sales to its non-discount customers. On rehearing, the Commission rejected Northern's argument that Panhandle barred this condition.
 
 
 19
 780 F.2d at 60-61 (citations and footnote omitted).[5]
 
 
 20
 Before the panel,[6] the Commission did not contend that Panhandle should be overruled, but rather that the condition imposed upon Northern did not violate Panhandle 's prohibition against the Commission "order[ing] adjustments in previously approved rates for services not before it in the certificate proceeding." 613 F.2d at 1133. As the Northern panel stated:
 
 
 21
 In its order denying rehearing and in this appeal, the Commission distinguished Panhandle on the basis that that case involved the flow-through of revenue between distinct classes of customers--transportation customers and gas-purchase customers--while this case involves customers of the same class. Thus, the Commission argues, here, unlike in Panhandle, [Northern's non-discount] sales were 'before' the Commission in the Section 7 proceeding, since the reasonableness and nondiscriminatoriness of the discount-sale rates for which approval was sought hinged upon the non-discount rates to the same class of customer. In other words, Northern's general rate structure for gas-purchase customers was necessarily brought into question.
 
 
 22
 780 F.2d at 62. The panel reasoned that "[i]t would be idle to pretend that there is no force to this distinction," because "[o]nce it is acknowledged that the Commission has authority to fix some rates under Section 7, see Atlantic Refining [Co. v. Public Service Commission, 360 U.S. 378, 79 S.Ct. 1246, 3 L.Ed.2d 1312 (1959) ], one is merely arguing over how much Section 7 will be permitted to override Sections 4 and 5." Id. (emphasis in original). Although the panel considered the Commission's distinction "elegant" and believed that "[d]rawing the line at rates for the very services sought in the Section 7 proceeding is not inevitable (and not necessarily required by the result in Panhandle )," id., it nevertheless drew the line at that point. In justifying this result, the panel stated that "we acknowledged in Panhandle that in a Section 7 proceeding all the applicant's rates are 'before' the Commission," and that "[w]e are not inclined to commit ourselves to determining ... case-by-case, which rates are 'before' the Commission more than others," an enterprise that the panel thought would "only spawn further litigation articulating and refining ineffable distinctions." Id. at 62-63 (emphasis in original).
 
 
 23
 The panel therefore invalidated the condition imposed on Northern's discount service certificate because the condition would alter the rates for Northern's previously certificated non-discount service. Yet, the panel expressed some misgiving over the correctness of the Panhandle rule:It may be true that the consequence of this holding, in the present case and in many others, will be to compel the Commission to reject innovative certification proposals that benefit some customers while leaving others at least no worse off. But since that is always the effect of Panhandle, it is an argument for overruling the case rather than a guide to interpreting it. Whatever its merits, Panhandle is the law of this circuit, and we are required to follow it unless and until it is reversed by the court en banc.
 
 
 24
 Id. at 63 (emphasis in original). Having granted rehearing en banc, we now turn to the "merits" of Panhandle.
 
 
 25
 II. SHOULD PANHANDLE BE OVERRULED?
 
 A. The Commission's Case
 
 26
 Our review of the Commission's interpretation of its authority under section 7 is governed by Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). It is undisputed that the Act is "silent or ambiguous with respect to the specific issue" of the lawfulness vel non of the revenue-crediting condition. Id. at 843, 104 S.Ct. at 2782. Under Chevron, we must therefore determine whether the Commission's interpretation is "reasonable." Id. at 844, 104 S.Ct. at 2783.
 
 
 27
 The Commission presents two arguments for why its interpretation is reasonable, both of which are directed to perceived errors in the Panhandle court's analysis.[7] First, the Commission contends that the factual premise for that decision (viz. that the Commission was altering rates through the section 7 condition) was simply erroneous: "[t]he Commission--through its revenue crediting condition--did not seek to adjust other rates not before it in the certificate proceeding. Rather, the Commission proposed a particular method of treating the additional revenues generated through the discount rate sales."[8]
 
 
 28
 Second, the Commission contends that the revenue-crediting condition is valid because the Commission's goal in imposing it is to prevent the pipeline from reaping "an unjustified windfall" in the period prior to the next section 4 rate review of the pipeline's services:
 
 
 29
 In evaluating [a section 4 rate] filing, the Commission takes into account a pipeline's historical and projected revenues and costs and sets just and reasonable rates allowing the pipeline a fair rate of return. However, between rate cases, a pipeline may well generate additional revenues.
 
 
 30
 In this setting, gas pipelines have sought and obtained Commission certificates to perform services for which they would receive significant additional revenues which were not part of the cost of service upon which current rates were based. In a Panhandle type circumstance, a pipeline was granted a certificate to perform a transportation service for which it would receive unanticipated revenues.... [I]n cases such as Northern, pipelines have sought to retain customers with alternative fuel capability by filing innovative discount certificate applications.
 
 
 31
 It is the Commission's view that since revenues so obtained are not part of the cost of service upon which a pipeline's presently effective rates were set, to permit the pipeline to retain these revenues would present an unjustified windfall wholly at odds with proper regulatory treatment....
 
 
 32
 Absent revenue crediting, a pipeline's other customers would be forced to bear all of the pipeline's fixed costs, even if these customers are barred from using the new service. The revenue crediting condition is a mechanism for using the revenues from a new service to offset the cost burden assigned to these other customers in the last rate case. Since the revenues and costs for new services will not be included in a pipeline's overall rate design until its next rate case, revenue crediting is the only practical means of preventing a windfall.[9]
 
 
 33
 According to the Commission, this revenue-condition conforms with Atlantic Refining Co. v. Public Service Commission, 360 U.S. 378, 79 S.Ct. 1246, 3 L.Ed.2d 1312 (1959), in which the Supreme Court approved the Commission's practice of imposing a temporary rate condition upon section 7 certificates. To support this interpretation, the Commission quotes from the dissent in Panhandle which, citing that Supreme Court decision, characterized the revenue-crediting condition as "the classic situation in which the Commission employs the Section 7 conditioning power--to 'hold the line,' or maintain the status quo --until a full cost-of-service proceeding is completed."[10]
 
 
 34
 The Panhandle court rejected this view, reasoning that such a condition, assuming arguendo it served a legitimate regulatory goal, exceeded the Commission's authority under section 7 because it would undermine sections 4 and 5 of the Act.[11] The dissent in Panhandle, on the other hand, contended that the court misunderstood the respective roles of those provisions and that, upon proper analysis, the Commission could use all three provisions to ensure that natural gas companies earn "a just and reasonable rate of return"[12]:
 
 
 35
 The majority assumes that the revenue flow-through requirement here imposed would have been permissible pursuant to a Section 4 proceeding, but that for some reason it could not be imposed in a Section 7 proceeding. This misconceives the differences between the two sections. Section 4 has no magical property that affords the Commission greater powers than it otherwise would have. Rather, the main difference between the sections is that Section 4 is the mechanism for evaluating changes in the costs associated with already certificated services, while Section 7 provides the mechanism for pricing and conditioning new services. Under Section 7 FERC has ample authority to ensure that certification of a new service--such as transportation--does not create an imbalance in the pipeline company's overall profit structure.[13]
 
 
 36
 Because the revenue-crediting condition before the court did not yield "an overall lowering of the rate of return" earned by Panhandle, the dissent concluded that the Commission "had [not] overstepped its authority" under section 7.[14]
 
 B. Analysis
 
 37
 The Commission's arguments for overruling Panhandle therefore reduce to: (1) the Commission was simply not altering rates by imposing the revenue-crediting condition; therefore, the court's concerns were misplaced; and (2) Supreme Court precedent authorizes the Commission to exercise its conditioning power in order to "hold the line" on a company's rate of return. Discerning no other questions that must be addressed in deciding whether to overrule Panhandle, we therefore turn to these two arguments.
 
 
 38
 We may quickly dispose of the contention that the Commission was not altering rates by imposing the revenue-crediting condition. It is difficult to understand exactly what is meant by this assertion. In the lexicon of utility regulation, "rate" refers to the amount that a customer pays and a utility receives for a unit of a particular service (e.g., "$1 per mcf of gas").[15] In Panhandle, as in this case, the revenue-crediting condition would lower the amount paid by customers for the existing service, i.e., the rate.[16] The fact that the Commission accomplishes this end by "requir[ing] [the company] to dispose of new revenues in a particular way"[17] is of utterly no moment--"a difference without a distinction," to quote the Panhandle opinion.[18]
 
 
 39
 The real question is whether the Panhandle court properly held that the section 7(e) "conditioning power does not extend to adjusting previously approved rates for services not before the Commission in the relevant certificate proceeding."[19] The Panhandle court, the dissent in that case, and the Commission all agree that the key to resolving this question is the Supreme Court's decision in Atlantic Refining Co. v. Public Service Commission, 360 U.S. 378, 79 S.Ct. 1246, 3 L.Ed.2d 1312 (1959) (CATCO ), but they disagree fundamentally on what that case stands for.[20] The dissent cited CATCO for the proposition that revenue-crediting is "the classic situation in which the Commission employs the Section 7 conditioning power--to 'hold the line,' or maintain the status quo-until a full cost-of-service proceeding is completed."[21] The dissent appears also to have relied upon CATCO for the proposition that "the main difference between the sections is that Section 4 is the mechanism for evaluating changes in the costs associated with already certificated services, while Section 7 provides the mechanism for pricing and conditioning new services."[22] The Panhandle court, however, rejected this construction of CATCO, explaining that the Supreme Court approved a section 7 price condition that in no meaningful way resembles a revenue-crediting condition.[23]
 
 
 40
 Before analyzing CATCO, we must first conduct a short review of natural gas regulation under the Act. As the introductory passage from Panhandle quoted above suggests,[24] sections 4, 5, and 7 of the Act reveal a single and coherent design. Under sections 4 and 5, the Commission determines the allowable price of natural gas services, holding price (i.e. rate) to a "just and reasonable" standard. Under section 7, the Commission determines what services may be provided (as well as through which facilities), reviewing them under a "public convenience and necessity" standard. Congress' concern in regulating the provision of services and facilities under section 7 was to avoid "the possibilities of waste, uneconomic and uncontrolled extensions,"[25] thereby "conserving one of the country's valuable but exhaustible energy resources"[26] as well as ensuring "the lowest possible reasonable rate consistent with the maintenance of adequate service in the public interest."[27]
 
 
 41
 FPC v. Hope Natural Gas Co., 320 U.S. 591, 64 S.Ct. 281, 88 L.Ed. 333 (1944), was the Supreme Court's first occasion to address the relationship between these three provisions of the Act. In that case, West Virginia appealed a section 5 rate reduction order issued by the Commission upon a finding that existing rates were not "just and reasonable." In supporting the pre-reduction rate, West Virginia, citing the Act's concern with conserving exhaustible natural gas supplies, argued that the Commission had failed to consider conservation when it reduced the rates, thereby encouraging consumption (as well as lowering West Virginia's tax revenues). The Court rejected these arguments, stressing the distinct purposes of section 7, on the one hand, and sections 4 and 5 on the other:
 
 
 42
 "When it comes to cases of abandonment or of extensions of facilities or service, we may assume that ... considerations of conservation are material to the issuance of certificates of public convenience and necessity. But the Commission was not asked here for a certificate of public convenience and necessity under Sec. 7 for any proposed construction or extension. It was faced with a determination of the amount which a private operator should be allowed to earn from the sale of natural gas across state lines through an established distribution system. Secs. 4 and 5, not Sec. 7, provide the standards for that determination."
 
 
 43
 Id. at 612, 64 S.Ct. at 292 (emphasis added).
 
 
 44
 Throughout the 1940's and early 1950's, in accordance with the strict division of statutory labor announced in Hope Natural Gas, the certification and rate-setting process worked along the following lines. A pipeline or producer seeking to offer a new service would apply to the Commission for a certificate of public convenience and necessity. Taking into consideration a host of factors,[28] the Commission would determine whether this new service was in the "public convenience and necessity." The Commission might inspect, among other things, the contractual rate for the new service, in order to assure itself that the natural gas company would earn sufficient revenues to continue providing the service, as well as to ascertain whether the new service would crowd-out other natural gas "end uses" that the Commission believed were superior, and therefore more deserving of the exhaustible resource.[29]
 
 
 45
 In general, the Commission during this period did not use its section 7(e) conditioning power to set rates.[30] Instead, the practice was as suggested in United Gas Pipe Line Co. v. Mobile Gas Corp., 350 U.S. 332, 340-43, 76 S.Ct. 373, 378-80, 100 L.Ed. 373 (1956) and Sunray Mid-Continent Oil Co. v. FPC, 364 U.S. 137, 143-47, 80 S.Ct. 1392, 1396-98, 4 L.Ed.2d 1623 (1960). Upon receiving section 7 certification, the natural gas company would begin providing the new service, at the contractual rate agreed upon by it and the purchaser. The natural gas company filed these contractual rates with the Commission, as required by section 4(c). If the Commission believed that a pipeline's rates were not "just and reasonable" (or were "unduly discriminatory" or 'preferential"), it instituted a section 5 proceeding. (The Commission did not then believe that it had authority under the Act to review producer rates.) If the Commission, after notice and hearing, determined a lower rate to be "just and reasonable," it ordered a prospective rate reduction. Under the Act, the Commission bore the burden of proof on this issue, and the natural gas company did not have to refund revenues received prior to the section 5 order pursuant to a rate that exceeded the level later determined to be "just and reasonable."
 
 
 46
 If the natural gas company later negotiated contractual authority to charge a higher rate, it applied to the Commission under section 4 for permission to do so. By operation of the Act, the higher rate would not go into effect for one month, and the Commission could suspend its effectiveness for an additional five months. After that time, the natural gas company could charge the higher rate but, unlike under section 5, it would have to refund any amount it received in excess of the rate subsequently determined to be "just and reasonable." Also unlike section 5, the natural gas company bore the burden of proving that the higher proposed rate was "just and reasonable."
 
 
 47
 This procedural framework, under which the Commission set rates only under sections 4 and 5, apparently worked smoothly prior to Phillips Petroleum Co. v. Wisconsin, 347 U.S. 672, 74 S.Ct. 794, 98 L.Ed. 1035 (1954), in which the Court held that the Act required the Commission to review the rates of producers, as well as those of pipelines. The Commission, which had believed that it could review only pipeline rates, found its burden increased considerably. As a result, section 5 proceedings dragged on for years; in the interim, producers and pipelines earned excessive but non-refundable sums by charging rates that had never been determined to be "just and reasonable."
 
 
 48
 To remedy this situation, the Commission adopted the practice of imposing upon section 7 certificates the condition that the natural gas company initially charge a rate (the so-called "in-line" price) determined by the Commission to be at a level in line with rates previously determined to be "just and reasonable."[31] The natural gas company was free immediately thereafter to file a section 4 request for the contractual rate, but of course could not begin charging it until after the suspension period had expired. Furthermore, pursuant to section 4, the natural gas company would have to make a refund if the "just and reasonable" rate was later determined to be lower than the contractual rate.[32] By imposing the in-line price condition, so that the initial Commission rate review was conducted pursuant to section 4 rather than section 5, the Commission ensured that, because of the refund provision in section 4, natural gas companies would not be able to charge rates above the "just and reasonable" level due solely to administrative delay.
 
 
 49
 The Supreme Court upheld the Commission's use of in-line price conditions in CATCO, the decision over the meaning of which this court divided in Panhandle. In reversing the Commission's grant of an unconditional section 7 certificate, which permitted a rate that the Commission in the certificate proceeding had twice rejected as excessive, the Supreme Court in CATCO stated:
 
 
 50
 In view of this framework in which the Commission is authorized and directed to act, the initial certificating of a proposal under Sec. 7(e) of the Act as being required by the public convenience and necessity becomes crucial. This is true because the delay incident to determination in Sec. 5 proceedings through which initial certificated rates are reviewable appears nigh interminable.... This long delay, without the protection of refund, as is possible in a Sec. 4 proceeding, would provide a windfall for the natural gas company with a consequent squall for the consumers. This the Congress did not intend. Moreover, the fact that the Commission was not given the power to suspend initial rates under Sec. 7 makes it the more important, as the Commission itself says, that "this crucial sale should not be permanently certificated unless the rate level has been shown to be in the public interest."
 
 
 51
 * * *
 
 
 52
 It is true that the Act does not require a determination of just and reasonable rates in a Sec. 7 proceeding as it does in one under either Sec. 4 or Sec. 5. Nor do we hold that a "just and reasonable" rate hearing is a prerequisite to the issuance of producer certificates. What we do say is that the inordinate delay presently existing in the processing of Sec. 5 proceedings requires a most careful scrutiny and responsible reaction to initial price proposals of producers under Sec. 7....
 
 
 53
 This is not an encroachment upon the initial rate-making privileges allowed natural gas companies under the Act, but merely the exercise of that duty imposed on the Commission to protect the public interest in determining whether the issuance of the certificate is required by the public convenience and necessity, which is the Act's standard in Sec. 7 applications. In granting such conditional certificates, the Commission does not determine initial prices nor does it overturn those agreed upon by the parties. Rather, it so conditions the certificate that the consuming public may be protected while the justness and reasonableness of the price fixed by the parties is being determined under other sections of the Act. Section 7 procedures in such situations thus act to hold the line awaiting adjudication of a just and reasonable rate. Thus the purpose of the Congress "to create a comprehensive and effective regulatory scheme," is given full recognition. And Sec. 7 is given only that scope necessary for "a single statutory scheme under which all rates are established initially by the natural gas companies, by contract or otherwise, and all rates are subject to being modified by the Commission...." On the other hand, if unconditional certificates are issued where the rate is not clearly shown to be required by the public convenience and necessity, relief is limited to Sec. 5 proceedings, and, as we have indicated, full protection of the public interest is not afforded.
 
 
 54
 360 U.S. at 389-92, 79 S.Ct. at 1253-55 (citations omitted) (emphasis added).
 
 
 55
 The Panhandle dissent relied on CATCO 's "hold the line" language to support the argument that the revenue-crediting condition represents "the classic situation in which the Commission employs the Section 7 conditioning power--to 'hold the line,' or maintain the status quo --until a full cost-of-service proceeding is completed,"[33] and the Commission has embraced this reading of CATCO in its brief before us.[34] Yet, as the Panhandle court correctly reasoned,[35] CATCO stood for a far different proposition. As is apparent from our description of the facts of that case, and as the quoted language clearly expresses, the in-line price condition was an innovative use of section 7, one made necessary because of the administrative delays in section 5 proceedings following the Phillips Petroleum decision. CATCO also indicates the extremely limited nature of the Commission's rate setting authority under section 7. As the Supreme Court stated, the in-line price condition is imposed only in order to "hold the line" on the price of a service "while the justness and reasonableness of the price fixed by the parties is being determined under other sections of the Act." Consequently, the Commission's imposition of the in-line price condition does not fix rates in derogation of the statutory mechanisms for conducting such rate review (i.e., sections 4 and 5). Instead, the in-line price condition constitutes an "interim measure"[36] that has precisely the opposite effect, one of guaranteeing that customers pay only rates that the Commission, under sections 4 and 5, later approves as "just and reasonable."[37] It was only on this understanding--that the in-line price condition is necessary to preserve the integrity of "just and reasonable" rate review under sections 4 and 5--that the Court in CATCO approved this particular exercise of the Commission's certificate conditioning power.[38]
 
 
 56
 At this point, it hardly needs stating that CATCO does not support the particular "hold the line" proposition for which the Commission cites it. True, like the in-line price condition in CATCO, the revenue-crediting condition is imposed on the occasion of certificating a new service. Yet, instead of imposing a temporary price condition on that new service, effective only pending the application for a rate increase under section 4 (subject of course to refund if the proposed rate is later found not to be "just and reasonable"), the revenue-crediting condition replaces a rate previously determined to be "just and reasonable" with one that has not been put to that test, thereby violating the dictate of section 5 that a rate remain in place until the Commission, after having conducted an evidentiary hearing,[39] finds it is no longer "just and reasonable."[40] In imposing this condition, the Commission therefore does not "hold the line" on rates.
 
 
 57
 Perhaps the Commission interprets the "hold the line" language in CATCO to refer not to rates alone, but also to a company's rate of return.[41] This would certainly accord with the Panhandle dissent's overall argument that "Panhandle has no more right to increase its rate of return by keeping new transportation revenues--without resorting to Section 4--than FERC had to decrease the rate of return using its Section 7 powers."[42] Yet, there are two problems with such an interpretation of CATCO. First, nothing in the Court's opinion suggests that the Commission may use section 7 to "hold the line" on rates of return, as opposed to rates;[43] given the emphasis in other decisions that the Commission is to review rates in accordance with sections 4 and 5,[44] the absence of any support in CATCO leaves the Commission's proposition without any foundation in the case law, as the Panhandle court noted.[45]
 
 
 58
 Second, and more importantly, the Commission's argument rests on the faulty premise that "revenue crediting is the only practical means of preventing [the pipeline from reaping] a windfall" on account of the new service.[46] As the Act and the case law make clear, however, the Commission has ample authority, apart from the revenue-crediting condition, to ensure that an operator would only earn "just and reasonable" rates on its existing and proposed services. Under the Act, the Commission may conduct a section 5 review of the rates for the existing service if it believes that the introduction of the proposed service renders those rates no longer "just and reasonable."[47] In addition, under CATCO the Commission could impose an in-line price condition on the proposed service, which would no doubt prompt the operator to apply under section 4 for approval of its contractual rate for that service. During the section 4 proceeding, the Commission would be able to review the rate for the proposed service and that for the existing service, and determine whether each of them is "just and reasonable."[48] Accordingly, contrary to the Commission's representation, "the public interest here seems to be adequately protected by sections 4 and 5."[49] We therefore cannot read CATCO to authorize a revenue-crediting condition that emasculates those provisions, since the Supreme Court's purpose in that case was precisely the opposite; it approved the imposition of a rate-related condition in a section 7 proceeding in order to prevent the rate review contemplated in sections 4 and 5 from being undermined.
 
 
 59
 For the reasons set out above, we find the Commission's arguments to be unpersuasive. Our review of the Panhandle decision, in light of the Act and of the relevant case law of the Supreme Court and of this circuit, confirms the court's original conclusion that the revenue-crediting condition "would effectively emasculate the role of section 5 in the ratemaking scheme" and "allow[ ] circumvention of section 5 requirements of a hearing and specific findings as to justness and reasonableness of existing rates."[50] We also agree that, as a result of this circumvention of section 5, "[r]ate stability is destroyed ... [and] [p]rotections against revenue loss caused by administrative delay are seriously diluted."[51] As a result, we conclude that the revenue-crediting condition imposed in Panhandle was not based upon a "reasonable interpretation" of the Commission's authority under section 7. Chevron, 467 U.S. at 844, 104 S.Ct. at 2782. Accordingly, we decline to overrule Panhandle and reaffirm its holding that "the Commission does not have authority under section 7 to compel flow-through of revenues to customers of services not under consideration in that proceeding for certification."[52]
 
 
 60
 III. SHOULD Panhandle APPLY IN THIS CASE?
 
 
 61
 Having reaffirmed Panhandle, we must now decide whether the principle announced in that case bars the revenue-crediting condition imposed upon Northern's certificate for the discount resale service. The Commission offers three reasons why this condition should not be disapproved; two of them are interrelated and we take them up together.
 
 
 62
 A. "Rate Stability" and "Unduly Discriminatory Rates"
 
 
 63
 First, the Commission argues that, in creating the discount service, Northern itself altered previously approved rates (i.e., by discounting the resale service for utility purchasers with fuel-switchable customers), and the Commission in imposing the revenue-crediting condition simply restored rate "stability." In support of this proposition, the Commission cites CATCO and argues that, absent the condition restoring "stability," it could not have certificated the discount service as being in the "public convenience and necessity" under section 7.[53]
 
 
 64
 Second, the Commission argues along similar lines under section 5 that the rate for the discount service would have been "unduly discriminatory," absent the condition, when compared to the non-discount service rate. Relying upon language from this court's opinion in Public Service Commission of New York v. FERC, 680 F.2d 252, 254 n. 1 (D.C.Cir.1982) ("FERC may not grant a certificate of convenience and necessity without determining that the rates proposed are just and reasonable"), which cited CATCO as support, the Commission concludes that it therefore would have been compelled to disapprove the discount service as not in the "public convenience and necessity."[54]
 
 
 65
 In sum, the Commission contends that the proposed discount service would not be in the "public convenience and necessity" without the revenue-crediting condition, either because "rate stability" would be upset or else because the resulting rates would be "unduly discriminatory." The Commission relies upon CATCO to support both contentions, but in so doing it suffers under the misapprehension we have already addressed above. With respect to rate stability, as we have seen, the Court in CATCO permitted in-line price conditioning to ensure that, pending eventual review for justness and reasonableness, prices for newly certificated services would not be out of line with rates already approved as "just and reasonable" for comparable services. This in-line practice does not justify the Commission in overturning rates previously determined to be "just and reasonable" when the Commisison perceives a disparity between those rates and the proposed rates for the new service. Instead, the Commission may preserve "stability" through use of its authority under sections 4 and 5 to permit only a "just and reasonable" rate for the discount service and to adjust the rate for the non-discount service if it is no longer "just and reasonable." The reasons relied upon in Panhandle apply with equal force in this context--to permit the Commission to evade the requirements of sections 4 and 5 through use of its section 7 authority would "effectively emasculate" those provisions.
 
 
 66
 The Commission's second argument--that the revenue-crediting condition is justified because otherwise the discount rate would be "unduly discrmiminatory"--is similar but even less persuasive. CATCO does not support such an exercise of the Commission's conditioning power, and this court has held on numerous occasions that the Commission must comply with the procedural dictates of section 5 in attempting to reallocate differential cost burdens that it believes result in rates that are no longer "just and reasonable."[55] For the Commission to achieve this end through use of its section 7 conditioning authority would have the same impermissible result of effectively emasculating section 5.[56] Panhandle therefore cannot be distinguished on this ground.
 
 
 67
 B. Was the Non-Discount Service "Before" the Commission?
 
 
 68
 The Commission's third argument for distinguishing Panhandle is that in this case the existing non-discount service was properly "before" the Commission.[57] Distinguishing Panhandle on the ground that the existing resale service and the proposed transportation service there were unrelated, the Commission argues here that there is a "direct nexus"[58] between Northern's existing non-discount resale service and its proposed discount resale service, viz. that the discount service will be offered to those current customers of the non-discount service who resell the natural gas to purchasers that have the capacity to switch to oil. Utilities that purchase gas from Northern and resell it to customers who are not "fuel-switchable" will be eligible to receive only the existing non-discount service. Accordingly, the Commission argues that in order to evaluate whether the discount service serves the public convenience and necessity, it is necessary to analyze the two "similar services"[59] together: "Thus, in the Commission's view, the rate impact on all of Northern's resale customers was before the Commission in the certificate proceeding."[60]
 
 
 69
 In other words, the Commission has "before" it any rates it may evaluate in order to resolve the status of a proposed service under the "public convenience and necessity" standard of section 7. The Commission's argument, while ingenious, places far too much emphasis on the phrase "before [it] in the certificate proceeding" in order to give a particular meaning to Panhandle. This becomes obvious when the referenced statement is read in context:
 
 
 70
 [W]e hold that the Commission does not have authority under section 7 to compel flow-through of revenues to customers of services not under consideration in that proceeding for certification.
 
 
 71
 In so doing, we do not mean to intimate the FERC may not take a company's overall rate structure into consideration in issuing certificate orders. It may evaluate that and myriad other factors as they bear on the public convenience and necessity. The Commission may not, however, order adjustments in previously approved rates for services not before it in the certificate proceeding.[61]
 
 
 72
 If the Panhandle court meant what the Commission now suggests, then a natural gas company's every rate is "before" the Commission if the Commission considers the company's "overall rate structure" in the proceeding; under this interpretation of Panhandle, all these rates would be vulnerable to rate adjustment in a section 7 condition. Of course, such an interpretation reduces the rule of Panhandle to a nullity; indeed, it would render the result in that very case inconsistent with the rule, because Panhandle's resale service was "before" the Commission, in this sense, when the Commission evaluated whether the transportation service was in the "public convenience and necessity."
 
 
 73
 We think that the only reasonable reading of the Panhandle court's statement that "the Commission may not ... order adjustments in previously approved rates for services not before it in the certificate proceeding" is that the Commission may condition only the rate of the particular service for which certification is sought, as occurs for example when the Commission establishes an in-line price. This is the clear import of the first sentence in the indented quotation above, which states the holding in Panhandle, and of which the "before" sentence is but a mere restatement. Accordingly, to borrow upon yet another restatement of the holding in Panhandle, "FERC may not as a condition on a section 7 certificate require a pipeline to adjust rates previously approved by the Commission for customers not receiving the services to be certificated."[62] In the section 7 proceeding before us, the Commission used the revenue-crediting condition to adjust the previously approved rate for the already certificated non-discount service. Under the clear dictate of Panhandle, this condition must be vacated.
 
 IV. CONCLUSION
 
 74
 We granted rehearing en banc to determine "whether this Court should continue to adhere to [the] decision in [Panhandle ], and, if not, in what respects it should depart therefrom." Having reviewed the Act, the case law, and the arguments before us, we have concluded that Panhandle was correctly decided and we decline to overrule it. Because the condition imposed by the Commission in this case violates the rule in Panhandle, we shall vacate it.[63] Since we are uncertain whether the Commission would have approved Northern's section 7 application without the condition we have vacated, or would have imposed a different condition, we remand the matter to the Commission for proceedings consistent with this opinion. See North Carolina v. FERC, 730 F.2d 790, 795-96 (D.C.Cir.1984).
 
 
 75
 So ordered.
 
 
 76
 WALD, Chief Judge, with whom Circuit Judge MIKVA joins:
 
 
 77
 I dissent from the en banc majority opinion because I find no bar, either in the text of the Natural Gas Act or in the overall structure of that Act, to the FERC's attachment of a condition to a section 7 certificate for a new service which not only sets an interim rate for that service at a rough approximation of a just and reasonable rate, but which also adjusts rates for other services that have been affected by the interim rate for the new service, in order to keep those rates at a just and reasonable level as well. The Commission has imposed the revenue-crediting condition at issue as an exercise of its broad power under section 7(e) of the Natural Gas Act, 15 U.S.C. 717(e), "to attach ... such reasonable terms and conditions as the public convenience and necessity may require" to section 7 certificates. Under established principles of deference to agency statutory interpretations, we may not second-guess the Commission's determination as to the conditions it may attach to a new service, unless we find that the statutory language or legislative history indicates a contrary congressional intent. See Chevron U.S.A. Inc. v. Natural Resources Defense Council, 467 U.S. 837, 842-45, 104 S.Ct. 2778, 2781-82, 81 L.Ed.2d 694 (1984). The majority offers no plausible explanation for its departure from the dictates of Chevron.[1] Instead, it engages in a lengthy discussion of section 4 and 5 and of the Supreme Court's decision in CATCO, without ever revealing why, if the Commission can set an interim rate for a new service under section 7 until the company chooses to file for an increased rate under section 4, it cannot adjust rates already filed by the same company, which have prima facie been rendered unjust and unreasonable by the new rate. In this case, the Commission attached to the certificate of public convenience and necessity issued to Northern for its discount sales service a condition requiring Northern to credit all revenues from the new service which represented recovery of fixed costs to customers of its existing, non-discount sales service. The condition was aimed at achieving a fair division of the burden of fixed costs between discount and non-discount customers and preventing Northern from receiving an unjustified windfall through recovery of more than 100% of its fixed costs. See FERC Rehearing Brief at 13-14.
 
 
 78
 The only statutory support the majority offers for its decision are the three arguments set forth in Panhandle, which the majority simply quotes without elaboration.[2] See maj. op. at 792. The majority first re-adopts the reasoning of Panhandle that permitting the Commission to use a section 7 condition to alter rates that have already been approved "would effectively emasculate the role of section 5 in the ratemaking scheme." Maj. op. at 792 (quoting Panhandle, 613 F.2d at 1129). Since Section 7 comes into play only when a company seeks to obtain a certificate of public convenience and necessity for a new service, there is in fact little danger that its excessive use could reduce section 5 to a "stopgap device"; proceedings under section 4 and section 5 will continue to govern the vast majority of rate determinations for which no new service is involved. Indeed, the use of section 7 conditions to establish interim rates for new services, approved by the Supreme Court, is itself also an exception to the usual section 4 and section 5 proceedings for setting rates. The narrow question here is whether this special section 7 power to set rates is limited to establishing the rate for a new service, or whether it extends to interim adjustments to compensate for the inequities the new rate may produce for old customers. The second Panhandle rationale, that rate stability will be destroyed if section 7 can be used to change existing rates, is similarly unconvincing since, as the majority repeatedly points out, the company can file under section 4 for a change in rates whenever it pleases. It is apparent that the majority's interest in rate stability is a one-way street: the Commission cannot protect consumers from the unfairness caused by the company's receiving a windfall from the new section 7 rate, so long as the company is satisfied with the status quo, but if the company thinks the rate set for the new service is too low, it can immediately file for an increase under section 4. The third Panhandle rationale, and the only one that seems at all thought-provoking to me, is that permitting the Commission to use section 7 to alter rates which have already been determined to be just and reasonable would circumvent the section 5 due process requirements of a hearing and a finding by the Commission that the previously approved rates have subsequently become unjust and unreasonable. Ultimately, however, I find that the majority's highly formalistic approach to statutory construction has little to recommend it here either, since it is Northern's own action in seeking certification for a new service under section 7 which has created the dilemma for the Commission, the potential unfairness to the old customers and a windfall for the company. In these circumstances, it is difficult to see how permitting the Commission to protect consumers by adjusting Northern's rates on an interim basis disrupts the statutory scheme, especially since Northern can immediately file for a new rate under section 4 if it feels that the interim rate is too low or that the revenue-crediting condition is onerous or unfair.
 
 
 79
 The majority attempts to rely on the Supreme Court's decision in Atlantic Refining Co. v. Public Service Commission, 360 U.S. 378, 79 S.Ct. 1246, 3 L.Ed.2d 1312 (1959) (CATCO ), to bolster its conclusion that FERC transcended its statutory authority in imposing this condition on a section 7 certificate. The majority, however, in discussing CATCO acts as if the issue in this case turned on whether the Supreme Court in that case had specifically authorized the Commission to impose this revenue-crediting condition. See maj. op. at 788-792. Of course it did not, since this case was not before it. The majority's analysis misses the real question raised by CATCO : why, when section 7 authorizes the Commission to impose conditions on the certificate issued for a new service, and the Supreme Court held in CATCO that those conditions may include setting an interim rate for that service, may the Commission not require adjustments in rates for the same company's other services that are affected by the new rate? The critical point is this: Nothing in CATCO remotely suggests that the power to set rates under 7 is limited to rates for the services being certificated. As Judge (now Justice) Scalia noted in his opinion for the panel in this case,
 
 
 80
 Once it is acknowledged that the Commission has authority to fix some rates under Section 7, see [CATCO ], one is merely arguing over how much Section 7 will be permitted to override the purposes of Section 4 and 5. Drawing the line at rates for the very services sought in the Section 7 proceeding is not inevitable....
 
 
 81
 780 F.2d at 62 (emphasis in original). Chevron counsels us that in the absence of any statutory language or legislative history to support the distinction between setting rates for new services under section 7 and adjusting rates for existing services under that section, the decision as to "how much" must be left to the Commission.
 
 
 82
 The majority never really distinguishes the revenue-crediting condition involved in this case from the price condition approved in CATCO in any terms that are meaningful under Chevron. As the majority notes, one reason CATCO allowed the use of interim price conditions was the delay involved in section 5 proceedings. See maj. op. at 798. The majority's decision in this case forces the Commission to initiate a lengthy and cumbersome section 5 proceeding to deal with the inequities created by the new rate; in the meantime, the company can continue to collect excessive, non-refundable rates. Like the price condition in CATCO, the rate imposed here is effective only until the company files for an increased rate under section 4. Thus, the rate here is just as much an interim measure as the one approved in CATCO. The majority appears to place great weight on the idea that the condition in CATCO only acted to "hold the line" pending proceedings under sections 4 and 5, while here the Commission is altering a rate that has been set in an earlier proceeding. See maj. op. at 791. If there is a difference, it seems largely a semantic one based upon how one defines "holding the line" and whose line is to be held--the customers' or the company's. The Commission in this case decided to hold the line for the old customers by ensuring that the rates they paid would continue to be just and reasonable, pending a proceeding under section 4 or section 5 in which the rates for both the old and new services could be reviewed. There is certainly nothing in the Act or in CATCO that confines the Commission's section 7 authority to the precise kind of line-holding involved in that case.
 
 
 83
 The effect of the majority's decision here is to give the company a windfall by permitting it to recover more than 100% of its fixed costs, while forcing consumers of the existing services to "bear all of the pipeline's fixed costs, even if these customers are barred from using the new service." FERC Rehearing Brief at 13-14. I am unpersuaded by the majority's glib response that "the Commission has ample authority, apart from the revenue-crediting condition, to ensure that an operator would only earn 'just and reasonable' rates on its existing and proposed services." Maj. op. at 792. The suggestion that the FERC's authority to initiate a proceeding under section 5 is an adequate remedy can be quickly rejected, since it was precisely the practical problems inherent in such proceedings (significant delay and the absence of any requirement that the pipeline refund excessive rates collected while the section 5 proceeding is pending) that led the Supreme Court to approve the price condition at issue in CATCO. It also seems highly improbable that a company which is receiving a windfall by collecting more than 100% of its fixed costs will have any incentive to apply for a new rate under section 4. The majority opinion, by denying the Commission any power under section 7 to break this logjam, immunizes the company from any just reapportionment of its fixed costs, and leaves the Commission powerless, unless it is willing to undertake the cumbersome and time-consuming section 5 proceeding, the avoidance of which, the majority asserts, was the justification for allowing the establishment of interim rates under section 7 for new services. Without a scintilla let alone a clear indication of congressional intent that section 7 power was to be so circumscribed, I cannot join the majority in holding that the FERC is effectively precluded from preventing Northern from reaping a windfall at the expense of its customers.
 
 
 84
 I respectfully dissent.
 
 
 
 [1]
 15 U.S.C. Sec. 717f (1982). The original section 7, Pub.L. 75-688, 52 Stat. 821, 824 (1938), was substantially amended in 1942. See Pub.L. 77-444, 56 Stat. 83 (1942). Subsequent amendments, see Pub.L. 80-245, 61 Stat. 459 (1947); Pub.L. 95-617, 92 Stat. 3117, 3173 (1978), are not relevant to this case
 
 
 [2]
 15 U.S.C. Secs. 717c, 717d
 
 
 [3]
 The Minnesota Department of Public Service
 
 
 [4]
 See Sea Robin Pipeline Co. v. FERC, 795 F.2d 182, 183-84 (D.C.Cir.1986)
 
 
 [5]
 The facts are more fully set forth in Part I of the panel's opinion, 780 F.2d at 60-61, which was not affected by the court's order granting rehearing en banc
 
 
 [6]
 The panel's discussion of the Commission's claims is found in Part II of its opinion, 780 F.2d at 61-63, which was vacated when the court ordered rehearing en banc
 
 
 [7]
 Although decided prior to Chevron, the Panhandle court applied the principles that the Court later announced. The court in Panhandle first determined, in effect, that "the statute [was] silent or ambiguous with respect to the specific issue" of the revenue-crediting condition, as prescribed by Chevron, 467 U.S. at 843, 104 S.Ct. at 2782, when it noted that "[t]he actual language of section 7(e) is broad indeed[,] ... [and that] this broad mandate conceivably could authorize adjustment of rates not involved in the actual certificate proceeding." Panhandle, 613 F.2d at 1128
 As Chevron requires in such instances, 467 U.S. at 844, 104 S.Ct. at 2782, the court in Panhandle the proceeded, in effect, to assess whether the Commission's belief that the Act authorized it to impose this condition was a "reasonable interpretation" of section 7. In addressing this question, the Panhandle court stated that "section 7's broad conditioning power must be read in conjunction with sections 4 and 5," and it concluded that "[i]n that context, for three reasons we believe that the conditioning power does not extend to adjusting previously approved rates for services not before the Commission in the relevant certificate proceeding." Panhandle, 613 F.2d at 1128-29. According to the Panhandle court, such conditioning would "significantly undercut [ ] the policies of Secs. 4 and 5." Id. at 1131 n. 52. Although the Panhandle court did not phrase it in so many words, we read this as its conclusion that the Commission's interpretation was unreasonable.
 
 
 [8]
 Brief of the Federal Energy Regulatory Commission on Rehearing En Banc (hereinafter FERC Rehearing Brief) at 20 n. 13
 
 
 [9]
 FERC Rehearing Brief at 12-14 (footnotes omitted)
 
 
 [10]
 613 F.2d at 1146 (dissent of Wright, J.), quoted at FERC Rehearing Brief at 14
 
 
 [11]
 The court stated at one point that:
 In our view, the essence of the Commission's order is the adjustment of previously approved rates to reach the regulatory end of preventing any increase in Panhandle's profits (or mitigation of losses) from receipt of new transportation revenues. Assuming this questionable regulatory objective to be valid, we believe the means of implementing it used by the Commission is impermissible. While the Commission may consider a pipeline's rate of return in setting prices for certificated services, we do not believe FERC may order changes in other, previously approved, rates in the name of preventing a possible increase in the rate of return. Allowing the Commission to do so--even when the rate reductions are limited by the amount of revenue credited--significantly undercuts the policies of Secs. 4 and 5 as we have here outlined.
 613 F.2d at 1131 n. 52 (emphases in original).
 
 
 [12]
 Id. at 1148 (dissent)
 
 
 [13]
 Id. at 1147 (citation omitted)
 
 
 [14]
 Id. See FERC Rehearing Brief at 15: "To be sure, if the Commission were to condition a certificate upon an overall lowering of the pipeline's established rate of return, the Commission might have overstepped its bounds. But that is not what happened in Panhandle."
 
 
 [15]
 "Rate of return," on the other hand, refers to the profit that a utility earns from operations, as a percentage of its invested capital (e.g., 10 percent per annum)
 
 
 [16]
 See Panhandle, 613 F.2d at 1130 n. 52 (opinion of the court); 1146 (dissent) ("Admittedly, those customers are better off than before the order."). The Commission seems to dispute this fact in the instant case ("Consumers will continue to pay the effective tariff rates for the services."), FERC Rehearing Brief at 15, but if so, the contention makes no sense. The additional revenues earned from the transportation service in Panhandle and the discount service in this case had to find their way into someone's pockets, and the revenue-crediting condition was designed by the Commission to direct them into the pockets of resale and non-discount customers, respectively. See Panhandle, 613 F.2d at 1123; Northern Natural Gas, 780 F.2d at 61
 
 
 [17]
 Panhandle, 613 F.2d at 1146 (dissent) (emphasis in original)
 
 
 [18]
 Id. at 1130 n. 52 (opinion of the court)
 
 
 [19]
 Id. at 1129
 
 
 [20]
 See id. at 1131-33 (opinion of the court), 1146 & n. 20 (dissent)
 
 
 [21]
 Id. at 1146 (dissent)
 
 
 [22]
 Id. at 1147
 
 
 [23]
 Id. at 1131-32 (opinion of the court)
 
 
 [24]
 Supra at 780-81
 
 
 [25]
 S.Rep. No. 77-948, 77th Cong., 2d Sess., at 1 (1942); see H.R.Rep. No. 77-1290, 77th Cong., 1st Sess., at 2 (1941)
 
 
 [26]
 Federal Power Commission, Twentieth Annual Report (1940), p. 78, quoted with approval in FPC v. East Ohio Gas Co., 338 U.S. 464, 468-69, 70 S.Ct. 266, 268-69, 94 L.Ed. 268 (1950)
 
 
 [27]
 Section 7(c), 52 Stat. 821, 825 (1938), deleted, 56 Stat. 83 (1942). "The deletion of this language by the 1942 Amendment to Sec. 7 was not intended to change this congressionally declared purpose." Panhandle, 613 F.2d at 1127 n. 26; see CATCO, 360 U.S. at 388 n. 7, 79 S.Ct. at 125 n. 7
 
 
 [28]
 See S.Rep. No. 77-948, at 2; H.R.Rep. No. 77-1290, at 2-3
 
 
 [29]
 See FPC v. Transcontinental Gas Corp., 365 U.S. 1, 8-22, 81 S.Ct. 435, 439-46, 5 L.Ed.2d 377 (1961)
 
 
 [30]
 The Commission did set rates for new service in isolated instances. See In re Tennessee Gas and Transmission Co., 4 F.P.C. 293, 305-06 (1945); In re Louisiana-Nevada Transit Co., 2 F.P.C. 546, 549 (1939), aff'd sub nom Arkansas-Louisiana Gas Co. v. FPC, 113 F.2d 281, 284 (5th Cir.1940) (petitioner lacked standing to appeal rate condition); Wheat, Administration by the Federal Power Commission of the Certificate Provisions of the Natural Gas Act, 14 Geo.Wash.L.Rev. 194, 213-15 (1945). In these instances, however, the rates set under the section 7 certificate were for the proposed service for which certification was sought. The Commission has offered no evidence of a longstanding practice to use the conditioning power to alter existing rates, as was done in Panhandle and Northern Natural Gas. We may also infer that the Panhandle practice is of recent origin from this court's statement in 1976 that "the Commission has apparently departed from its existing, and approved, practice of using the Sec. 7 certification requirement as a 'holding operation on initial rates[,]' " Algonquin Gas Transmission Co. v. FPC, 534 F.2d 952, 955 (D.C.Cir.1976) (citation omitted), a statement that would not have made sense if the Commission's practice had been more generally to alter rates for existing services through section 7. See also Panhandle, 613 F.2d at 1132 ("FERC has not cited, and our own research does not disclose, any judicial authority holding that the Commission may tinker with rates previously found just and reasonable in conditioning a certificate dealing with other sales or services.")
 
 
 [31]
 See United Gas Improvement Co. v. Callery Properties, Inc., 382 U.S. 223, 227, 86 S.Ct. 360, 363, 15 L.Ed.2d 284 (1965) ("Consumer protection is afforded by keeping the 'in-line' price at the level where substantial amounts of gas have been certificated to enter the market under other contemporaneous certificates.... We believe the Commission can properly conclude under Sec. 7 that adequate protection to the public interest requires as an interim measure that gas not enter the interstate market at prices higher than existing levels.")
 
 
 [32]
 After CATCO, the question arose whether the refund would be the difference between the contract price and the "just and reasonable rate, or the difference between the contract price and the in-line price. The Court opted for the latter. FPC v. Sunray DX Oil Co., 391 U.S. 9, 23-24, 88 S.Ct. 1526, 1533-34, 20 L.Ed.2d 388 (1968); United Gas Improvement Co. v. Callery Properties, Inc., 382 U.S. at 227-28, 86 S.Ct. at 363
 
 
 [33]
 Panhandle, 613 at 1146 (dissent)
 
 
 [34]
 FERC Rehearing Brief at 14
 
 
 [35]
 Panhandle, 613 F.2d at 1131-33 (opinion of the court)
 
 
 [36]
 See United Gas Improvement Co. v. Callery Properties, Inc., 382 U.S. at 227, 86 S.Ct. at 363
 
 
 [37]
 We therefore reject the contention in the Panhandle dissent that "the main difference between the sections is that Section 4 is the mechanism for evaluating changes in the costs associated with already certificated services, while Section 7 provides the mechanism for pricing and conditioning new services." 613 F.2d at 1147. Our conclusion is reinforced by this court's decisions in Consumer Fed'n of America v. FPC, 515 F.2d 347 (D.C.Cir.), cert. denied, 423 U.S. 906, 96 S.Ct. 208, 46 L.Ed.2d 136 (1975), and Algonquin Gas Transmission Co. v. FPC, 534 F.2d 952 (D.C.Cir.1976), in which we reversed Commission actions under section 7 on the ground that they frustrated the requirement in sections 4 and 5 that rates be "just and reasonable." The fact that the Commission's actions involved newly certificated services was of no moment; what mattered was that the Commission's exercise of section 7 conditioning authority negated the requirements of sections 4 and 5
 The approach taken by the Supreme Court in CATCO and by this court in Consumer Federation, Algonquin Gas, and Panhandle--i.e. to determine the propriety of Commission's activities under section 7 by anticipating their impact on the interests implicated in sections 4 and 5--has been employed in other cases as well. See United Gas Improvement Co. v. Callery Properties, Inc., 382 U.S. 223, 86 S.Ct. 360, 15 L.Ed.2d 284 (1965); FPC v. Texaco, Inc., 377 U.S. 33, 84 S.Ct. 1105, 12 L.Ed.2d 112 (1964); FPC v. Hunt, 376 U.S. 515, 84 S.Ct. 861, 11 L.Ed.2d 878 (1964); Sunray Mid-Continent Oil Co. v. FPC, 364 U.S. 137, 80 S.Ct. 1392, 4 L.Ed.2d 1623 (1960).
 
 
 [38]
 For a contemporaneous, and parallel, reading of CATCO by this court, see Public Service Comm'n of New York v. FPC, 287 F.2d 146, 148 (D.C.Cir.1960), cert. denied sub nom., Hope Natural Gas Co. v. Public Service Comm'n, 365 U.S. 880, 81 S.Ct. 1031, 6 L.Ed.2d 192 (1961)
 
 
 [39]
 For the extensive evidentiary requirements involved in determining whether a rate is "just and reasonable," see United Gas Improvement Co. v. Callery Properties, Inc., 382 U.S. at 227-28, 86 S.Ct. at 363; Consumer Fed'n of America v. FPC, 515 F.2d at 356 n. 56
 
 
 [40]
 The Commission agrees that the revenue-crediting condition was not imposed in accordance with section 5:
 Indeed, it would, as practical matter, be impossible for the Commission to utilize its Section 7 certificate conditioning power to find a pipeline's current rate structure unreasonable. While a transportation service, off-system sale or discount rate schedule may generate significant additional revenues for interstate pipelines, they constitute but a minute portion of a pipeline's overall revenues. The Commission could not--based on the information before it in a discount rate certificate proceeding or a transportation certificate proceeding--determine that a pipeline's rates are unjust and unreasonable and utilize Section 7(e) to remedy that circumstance. Rather, if some suspicion that the pipeline's current rates were unjust and unreasonable was raised in the certificate proceeding, the Commission would likely commence a Section 5 rate investigation.
 FERC Rehearing Brief at 15 n. 9. See Panhandle, 613 F.2d at 1130 n. 51 (opinion of the court), 1148 (dissent).
 
 
 [41]
 The dissent in Panhandle also appears to have treated the two concepts interchangeably, referring both to "just and reasonable rates," a familiar phrase in rate regulation and one found in the Act itself, and to "a just and reasonable rate of return," an amalgam that is found nowhere in rate regulation or in the Act. 613 F.2d at 1148
 
 
 [42]
 Id., at 1148 (emphasis in original)
 
 
 [43]
 Indeed, as the Commission says, this would be "as a practical matter, impossible." See FERC Rehearing Brief at 15 n. 9, quoted at supra note 40
 
 
 [44]
 Of particular importance are this court's recent decisions in Sea Robin Pipeline Co. v. FERC, 795 F.2d 182, 183-87 (D.C.Cir.1986), ANR Pipeline Co. v. FERC, 771 F.2d 507, 513-14 (D.C.Cir.1985), and Public Service Comm'n of New York v. FERC, 642 F.2d 1335, 1342-46 (D.C.Cir.1980), cert. denied sub nom., FERC v. Public Service Comm'n, 454 U.S. 879, 102 S.Ct. 360, 70 L.Ed.2d 186 (1981), and Transcontinental Gas Pipeline Co. v. FERC, 454 U.S. 880, 102 S.Ct. 362, 70 L.Ed.2d 190 (1981) (Transco ). In these cases, we invalidated Commission action under section 4 that adjusted rates previously determined to be "just and reasonable." In requiring the Commission to comply with the mandates of section 5, we explained that "section does not authorize FERC to substitute rates of its own design for the rates proposed by the pipeline." Sea Robin, 795 F.2d at 183, citing Transco, 642 F.2d at 1344. Cf. United Gas Pipe Line Co. v. Mobile Gas Corp., 350 U.S. 332, 341, 76 S.Ct. 373, 379, 100 L.Ed. 373 (1956) (Sections 4 and 5 "are simply parts of a single statutory scheme under which all rates are established initially by the natural gas companies ... and all rates are subject to being modified by the Commission upon a finding that they are unlawful."). If for this reason the Commission may not use section 4, which undisputedly confers rate-review authority, to alter previously determined "just and reasonable" rates, then the conclusion seems inescapable that the Commission also may not use section 7 for this end, because the Commission's rate authority under that provision is much narrower than under section 4. Cf. Algonquin Gas Transportation Co. v. FERC, 534 F.2d 952 (D.C.Cir.1976) (Commission may not impose a section 7 condition that overrides the review provisions of section 4)
 
 
 [45]
 Panhandle, 613 F.2d at 1132 n. 62
 
 
 [46]
 See text and note at supra note 9
 
 
 [47]
 In addition to individual adjudications, the Commission may engage in generic rulemaking under section 5 in appropriate circumstances. See Associated Gas Distributors v. FERC, 824 F.2d 981, 1008-1009, 1015, 1019-1020 (D.C.Cir. 1987); Wiconsin Gas Co. v. FERC, 770 F.2d 1144, 1153, 1166-68 (D.C.Cir.1985), cert. denied, --- U.S. ----, 106 S.Ct. 1968, 1969, 90 L.Ed.2d 653 (1986); American Public Gas Association v. FPC, 567 F.2d 1016, 1064-67 (D.C.Cir.1977)
 
 
 [48]
 See Sea Robin Pipeline Co. v. FERC, 795 F.2d at 184. Of course, the Commission would have to comply with the terms of section 5 in adjusting the rates for the existing service
 
 
 [49]
 Panhandle, 613 F.2d at 1133 (opinion of the court)
 
 
 [50]
 Id. at 1129-30
 
 
 [51]
 Id. at 1130
 
 
 [52]
 Id. at 1133 (footnote omitted)
 
 
 [53]
 Brief of the Federal Energy Regulatory Commission (hereinafter "FERC Panel Brief") at 20: "All that the Commission has held here is that for Northern's proposed adjustment to that stable rate structure to be warranted by the public convenience and necessity, a corresponding adjustment--through the revenue crediting mechanism--must be made so that all customers will benefit." The Commission goes on to explain why it believes that its "all should benefit" criterion of the public convenience was not effectively rejected in Panhandle, 613 F.2d at 1131 n. 52
 
 
 [54]
 See FERC Panel Brief at 22-23
 
 
 [55]
 See cases discussed in supra note 44. It is also clear that " 'the mere fact of rate disparity' is not enough to constitute unlawful discrimination.' " Associated Gas Distributors v. FERC, supra note 47, 824 F.2d at 1009 quoting Cities of Bethany v. FERC, 727 F.2d 1131, 1139 (D.C.Cir.), cert. denied, 469 U.S. 917, 105 S.Ct. 293, 83 L.Ed.2d 229 (1984). See Wisconsin Gas Co. v. FERC, 770 F.2d at 1163
 Whether specific rates are "unduly discriminatory" under sections 4 and 5 is a question distinct from whether differential rates harm competition to an extent that the proposed service is not in the "public convenience and necessity." Where present, this latter, antitrust-type issue must indeed be addressed before a regulatory agency can determine whether a service is in the public interest. See FCC v. RCA Communications, Inc., 346 U.S. 86, 73 S.Ct. 998, 97 L.Ed. 1470 (1953) (Federal Communications Act); McLean Trucking Co. v. United States, 321 U.S. 67, 64 S.Ct. 370, 88 L.Ed. 544 (1944) (Interstate Commerce Act); Maryland People's Counsel v. FERC, 761 F.2d 780 (D.C.Cir.1985) (Natural Gas Act). Cf. Public Service Comm'n of New York v. FPC, 287 F.2d 143, 145 (D.C.Cir.1960).
 
 
 [56]
 The premise underlying the Commission's arguments has been that it confronted a choice of either imposing the revenue-crediting condition or else withholding certification, on the grounds that its concerns with rate stability and undue discrimination precluded the proposed service from being in the "public convenience and necessity." As noted above, it derives this point from one of our own opinions, Public Service Comm'n of State of New York v. FERC, 680 F.2d 252, 254 n. 1 (D.C.Cir.1982)
 As our previous discussions of CATCO in this case would suggest, this dictum in Public Service Comm'n misread CATCO. In that decision, the Supreme Court simply held that, given the "nigh interminable" delays in conducting section 5 proceedings, it would not be in the "public convenience and necessity" to certificate new services without an in-line price condition that would "hold the line awaiting adjudication of a just and reasonable rate." 360 U.S. at 389, 392, 79 S.Ct. at 1225. It was necessarily implicit in the in-line price practice, however, that "just and reasonable" rate review would occur after new services are certificated, not before. To dispel any doubts on the matter, the Court in CATCO stated that "the Act does not require a determination of just and reasonable rates in a Sec. 7 proceeding as it does in one under either Sec. 4 or Sec. 5. Nor do we hold that a 'just and reasonable' rate hearing is a prerequisite to the issuance of producer certificates." 360 U.S. at 390-91, 79 S.Ct. at 1254-55. Subsequent decisions have confirmed this point. See cases cited in supra note 39; Public Service Comm'n of New York v. FPC, 287 F.2d 143, 145 (D.C.Cir.1960).
 In this case, the Commission issued a section 7 certificate for Northern's discount service, subject to the revenue-crediting condition. Although we have vacated that condition, we have no occasion to decide whether the Commission could have simply denied the certificate for the reasons suggested by it, rather than impose appropriate conditions. Texaco, Inc. v. FPC, 290 F.2d 149, 155 (5th Cir.1961), suggested that we decided this question in the 1960 Public Service Comm'n of New York v. FPC cases, see supra and supra note 38. See also California Oil Co. v. FPC, 315 F.2d 652, 657 (10th Cir.1963). In our view, however, we left the question open. In any event, it is only necessary to clarify that the Commission is not required to withhold a certificate for the reason intimated in the 1982 Public Service Commission dictum.
 
 
 [57]
 See Panhandle, 613 F.2d at 1133 ("the Commission may not ... order adjustments in previously approved rates for services not before it in the certificate proceeding") (emphasis added)
 
 
 [58]
 FERC Rehearing Brief at 20 n. 13
 
 
 [59]
 FERC Panel Brief at 21. After oral argument en banc, we requested briefing on whether the Commission properly subjected the discount service to section 7 review, or whether Northern should have sought only section 4 approval to institute the discount service. After receiving comments from interested parties, the Commission responded (attaching those comments) that review pursuant to the "public convenience and necessity" standard of section 7 was appropriate given that certain non-rate contractual terms differentiated the discount and non-discount services. The Commission's policy is that "[w]henever those previously certificated express [non-rate] terms of service are proposed to be changed, a pipeline must obtain either a new Section 7 certificate or amended authority under an existing certificate to perform those changed services." (FERC Response to Remand at 11). This is a reasonable interpretation of the scope of its section 7 authority
 
 
 [60]
 FERC Panel Brief at 20. It could equally well be argued that the non-discount service was "involved in the pertinent certificate proceeding," as that phrase is used in Panhandle. 613 F.2d at 1133
 
 
 [61]
 613 F.2d at 1133 (footnote omitted)
 
 
 [62]
 Id. at 1130 (footnote omitted). We also find unpersuasive the formulation offered by intervenor Minnesota Department of Public Service:
 If a pipeline seeks to alter, substitute, vary, eliminate, or expand an existing, previously approved rate or service by filing a Section 7 application, with the requested rate or service being based on that existing rate or service, that pipeline has put the existing rate or service into issue before the FERC.
 Supplemental Brief on Rehearing at 10. This contention that a certificate application puts on the table all such related services must be rejected in light of the cases discussed in supra note 44. In those cases, which involved rate changes ordered by the Commission in response to a section 4 rate filing, we held that the Commission must comply with section 5 when altering those parts of the rate that the operator's filing had left unchanged.
 
 
 [63]
 We have reached the same result as did the panel before us, and so we reiterate its final disposition of this proceeding, which was vacated when rehearing was granted. For the reasons given by the panel, we dismiss Northern's challenge to the future crediting condition as unripe for review. See Northern Natural Gas, 780 F.2d at 63 (Part III)
 
 
 [1]
 There is no indication in Panhandle, which was decided before Chevron, that the court defined the issue before it as whether the Commission's interpretation was a "permissible construction of the statute." Chevron, 467 U.S. at 843, 104 S.Ct. at 2782. Rather, the Panhandle court, after noting that the validity of the revenue-crediting condition was "a rather close question," 613 F.2d at 1126, appears to have simply substituted its own interpretation of the Natural Gas Act for that of the Commission
 
 
 [2]
 Rehearing en banc was granted in this case to decide whether Panhandle should be overruled. See 780 F.2d at 64. The Panhandle decision therefore has no more presumed validity than any other panel opinion undergoing en banc reconsideration, the majority's extensive citation of that decision notwithstanding